CHELSEA INDUSTRIES, INC. vs. LAWRENCE A. GAFFNEY
& another.[1]

Suffolk. November 5, 1982. — April 29, 1983.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, LYNCH, & O'CONNOR, JJ.

*Practice, Civil,* Master. *Corporation,* Officers and agents. *Fiduciary. Interest. Damages,* Breach of employee's duty.

A master's conclusion that two executive employees of a corporation had violated their fiduciary duty while employed by the corporation was amply supported by his findings respecting their conduct during a period of approximately two years in preparing to establish a business which would compete with the corporation. [10-12]

In the absence of any evidence of the value of services properly rendered to a corporation by two of its executive employees who, during a period of approximately two years, had consistently pursued a thoroughly planned course of conduct directed toward the establishment of a competing business, the corporation could recover as damages, in an action against the two employees for breach of their fiduciary duty, the entire compensation it had paid to them during that period. [12-16]

In an action by a corporation against two of its executive employees who, during a period of approximately two years while employed by the corporation, had pursued plans directed toward the establishment of a competing business, the corporation could recover as an element of damages the compensation it had paid to two of its other employees whose services during the period in question had benefited the de-

---

[1] John McElroy.

fendants, and not the corporation, and whose violation of their fiduciary duty to the corporation had been approved and concealed by the defendants. [16-17]

In an action by a corporation against two of its executive employees who, in violation of their fiduciary duty to the corporation, had attempted to establish a competing business, and who, with two other employees, precipitously left their positions when their scheme was discovered, the corporation could recover as an element of damages the cost of the services of three of its other executive employees which it diverted in order to minimize disruption of the defendants' division, and which would otherwise have been available for its other business. [17-19]

CIVIL ACTION commenced in the Superior Court on December 5, 1977.

The case was heard by *O'Neil*, J., on a master's report.

After review was sought in the Appeals Court, the Supreme Judicial Court ordered direct appellate review on its own initiative.

*Blair L. Perry* (*George Donovan* with him) for the defendants.

*Arthur M. Gilman* (*Michael Eby* with him) for the plaintiff.

ABRAMS, J. The defendants appeal from a judgment of the Superior Court adopting and confirming the report of a master. The master found that the defendants were liable in damages to the plaintiff for setting up a competing business in violation of the fiduciary duty the defendants owed the plaintiff. The judgment ordered and adjudged the defendants to be "jointly and severally [liable to the plaintiff] in the amount of $496,009.72, together with costs." Essentially, the defendants claim that they "had the right to plan and prepare for creation of a competing business while carrying on the normal duties of their employment . . . without disclosing their plans to the plaintiff." The defendants also assert that there is error in the awarding of damages. The case was transferred to this court on our own motion. We conclude that there are no errors of law, but that there are some computation errors which require that we remand this matter to the Superior Court for correction.

We summarize the master's subsidiary findings of fact.[2] The defendants, Gaffney and McElroy, were executives of Ideal Tape Co. (Ideal),[3] one of twenty-six manufacturing divisions of Chelsea Industries, Inc. (Chelsea), a publicly held corporation. Ideal manufactures pressure sensitive tapes,[4] principally for sale to the shoe industry. The pressure sensitive tape business is highly competitive with annual sales of approximately one billion dollars. Ideal has accounted for approximately 70% of the sale of pressure sensitive tape to the shoe industry, and approximately 75% of its sales have been to the shoe industry.

Ideal's management offices and laboratory are located in Lowell, Massachusetts. In December, 1977, there were approximately 110 people working at the Lowell plant. Sales were made through salesmen employed by Ideal or through independent sales representatives. Ideal operates with a great deal of autonomy, but with general oversight from Chelsea's "shoe group" management.

Gaffney was hired by Ideal in 1970 and became its president and general manager in 1973, with complete responsibility for all operations, subject to Chelsea's limited supervision.[5] McElroy, a chemist, was hired by Ideal in 1964 and in 1976 became its vice president for research, development, and engineering. McElroy was responsible for Ideal's plant

---

[2] Additional facts will be set forth in our review of the defendants' substantive claims of error.

[3] The plaintiff, Chelsea Industries, Inc., is a publicly held Massachusetts corporation with twenty-six diverse manufacturing divisions (some of which are incorporated subsidiaries). The various divisions are called companies or divisions without regard to whether they are incorporated. The companies or divisions are grouped by product line. Ideal is an unincorporated division of the plaintiff's shoe group.

[4] Pressure sensitive tapes generally are fabrics coated with an adhesive substance. If applied with pressure to another material, the pressure sensitive tape will adhere to that material.

[5] Most of Chelsea's supervision was in matters of administration and accounting.

layout, machine design, product development, quality control and specification of raw materials. McElroy also was in charge of Ideal's laboratory.

The two other employees of Ideal who participated in the defendants' joint venture to set up a competing business were David Wormwood and Gerald Graff. Wormwood was vice president for manufacturing, responsible for production at Ideal's United States plants.[6] Graff, who had worked for Ideal for many years, became its United States shoe industry sales manager in 1975 and its vice president for domestic shoe sales in 1977. In both positions Graff was responsible for marketing Ideal's products to the domestic shoe industry, and for customer and sales personnel relations. None of the four executives had either a written employment, noncompetition, or nondisclosure agreement with Ideal, or was an officer or director of Chelsea. Ideal had two other executive employees, the comptroller and an individual in charge of international sales who spent most of his time outside the United States.

In December, 1975, Gaffney and McElroy decided to become "associated together in joint venture" to form their own competing business and leave Ideal.[7] The defendants consulted an attorney relative to procedures to be followed in setting up a competing business. They commissioned persons to find a location on which to build a factory, and to help them find equipment substantially similar to that used by Ideal.

Gaffney and McElroy were joined by Graff in April or May of 1976, and by Wormwood in December, 1976. During 1976 and 1977, the defendants, assisted at times by Graff and Wormwood, began to establish the new company. One of their transactions involved the purchase of

---

[6] In addition to Ideal's principal plant in Lowell, Massachusetts, it operates different portions of its manufacturing functions in St. Louis, Missouri; Exeter, New Hampshire; and Renaix, Belgium.

[7] Graff suggested forming a competing business to Gaffney in the spring of 1975, but Gaffney took no action at that time.

equipment suitable for making adhesives. Gaffney learned that Lightning Adhesive Company wanted to sell five pieces of mixing equipment as a unit for $31,000. Gaffney wanted to buy one piece of this equipment for Ideal. The market value of that piece was approximately $9,000. The defendants wanted another mixer for their own business. However, Lightning Adhesive Company would not sell the mixers individually. Using an equipment broker as a "straw"[8] to buy the equipment, Gaffney arranged for Ideal to purchase the one piece it needed for $14,000, paying $5,000 in excess of what he knew to be its fair market value and arranged for the defendants to purchase the remaining mixers for $17,000.

To this end, Gaffney had Ideal's comptroller prepare the necessary requisition to Chelsea and directed the straw to pay the comptroller a $500 "kickback" or bribe. The defendants gave the straw the $14,000 from Ideal and two bank cashier's or treasurer's checks totaling $17,000. Because these checks indicated that the defendants were the sources of the funds, the straw took the checks back to the banks and had new checks issued. He did this to conceal the defendants' participation. Ideal's equipment was delivered to it, and all the other equipment was shipped to the premises of a trucker engaged by Gaffney.

During 1976 and 1977, Gaffney, McElroy and Wormwood searched for, examined or evaluated equipment, which they wanted for their new business. They also attended auctions or other sales where such equipment could be bought. At some sales they were accompanied by the straw, and bids would be placed for Ideal and for the defendants' own business. Gaffney decided which equipment would be bid for Ideal, and which for the defendants' business, and the amounts to be bid.[9]

---

[8] "[A] person who is put up in name only to take part in a deal." Black's Law Dictionary 1274 (5th ed. 1979).

[9] The master was unable to determine if any of the equipment purchased by or for the defendants would have been desirable for purchase by Ideal. He concluded that "there was a clear conflict of interest on the part of the defendants on such occasions."

In 1976 or 1977, Graff prepared and presented to Gaffney a list of prospective customers to whom, Graff indicated, he could sell pressure sensitive tapes for the new business. They subsequently destroyed the list. Graff and Gaffney had numerous discussions during 1977 with reference to potential sales of such tapes to specific users in the shoe industry, including companies then purchasing such products from Ideal.[10]

With the defendants' knowledge, Wormwood, who had never before been interested, attended an equipment fair in Europe and visited Ideal's Belgium plant at Ideal's expense. The master found that this trip was designed to provide the defendants with information for their new business. During the trip Wormwood took extensive photographs of Ideal's plans and equipment in Belgium. The master found that this trip by Wormwood was not in the interests of Ideal.

The defendants also kept Phillip Dube, a dissatisfied maintenance mechanic who wanted to resign from Ideal, on Ideal's payroll for a few months, until September, 1977, when he went to work on the construction of the defendants' factory pursuant to an agreement with Gaffney. They replaced Dube with his son as a part-time maintenance mechanic.[11] The master found that the defendants subordinated Ideal's interest by keeping Dube on Ideal's payroll until such time as they could put him to work on their own project.

In 1977, the defendants, Wormwood, and Graff, met at Ideal, at restaurants, and at their homes, to discuss the proposed new business. Every effort was made by the four men to keep their plans and activities secret. In the spring

---

[10] The master concluded that although there was a readily available book containing names and addresses and certain other information pertaining to United States shoe manufacturers, that book did not include information as to the use or nonuse of pressure sensitive tapes.

[11] The master concluded that this resulted in the inadequate maintenance of Ideal's equipment and machinery.

of 1977, the four men agreed that if one of them was dis-
covered, all would leave Ideal at once.[12]

In 1977, the only salesman working out of Ideal's home
office was Frank DeMartino, a very competent salesman,
who had established good personal relationships with major
customers of Ideal in his area. DeMartino's sales had in-
creased steadily during his four years with Ideal. In April,
1977, DeMartino complained to Graff of an excessive work-
load. Graff proposed turning several of the salesman's ma-
jor accounts over to Gaffney's eighteen year old son, who
had no sales experience. DeMartino refused to turn over
the accounts even though Graff subsequently ordered him
to do so. At Gaffney's request, DeMartino discussed the
situation with Gaffney, who urged DeMartino to stay with
Ideal, but did not countermand Graff's order. DeMartino
resigned, and for several months thereafter, Ideal had no
New England salesman. After the defendants, Graff, and
Wormwood left Ideal, DeMartino returned to Ideal in an
executive sales capacity.

Also during 1976 and 1977, Graff and Gaffney continued
to travel extensively throughout the United States at Ideal's
expense, visiting and entertaining Ideal's major customers
and sales personnel.[13] In the master's general findings, he
determined that their intent was to facilitate their own
business's future sales.

In August, 1977, Gaffney, with some information sup-
plied by his other joint venturers, applied for a Small
Business Administration guaranteed bank loan for their new
business, which he later received. As part of the applica-
tion, he listed the equipment the company expected to use,

---

[12] The master concluded that if the four men (plus Gaffney's secretary)
left Ideal practically simultaneously, without prior notice to the plaintiff,
"[t]he obvious effect . . . would be to leave Ideal substantially without
operational or sales leadership, and thereby render it especially
vulnerable to competition by the defendants' new business."

[13] The master concluded that on these trips Gaffney and Graff intended
to cultivate close personal relationships with major customers of Ideal to
assist them in taking away business from Ideal when their own competing
business became operational.

including the mixers bought through the straw, and prospective sales and customers, most of whom were current customers of Ideal. In preparing this application, Gaffney informed some of these customers that he was planning to compete with Ideal, and discussed the potential of selling to them in the future.

Gaffney was responsible for recommending the rate of compensation for Ideal's other personnel, including recommending bonuses in accordance with Chelsea's policy.[14] Notwithstanding his knowledge of McElroy's, Graff's, and Wormwood's involvement in the joint venture, Gaffney continued to recommend, or to concur in the recommendation of, salary increases and bonuses for them in 1976 and 1977.

From 1975, until their plans were exposed in December, 1977, the defendants made no efforts to train their own replacements or to allow Chelsea to do so. They also retained Graff and Wormwood in positions of trust and did nothing either to train their replacements or to allow Chelsea to do so.

In October, 1976, the defendants purchased land in New Hampshire for their new business.[15] In November, 1977, the defendants incorporated their business in New Hampshire as Action Manufacturing Co. (Action), and were its sole shareholders and officers. Chelsea's vice president, Freeman, discovered Action's incorporation and the factory's construction on December 1 or 2, 1977, and the defendants submitted their resignations on December 3, 1977. On December 5, 1977, in response to questioning by Chel-

---

[14] Under Chelsea's policy, 10 % of Ideal's annual profit was available for bonuses. Chelsea's guidelines established that Gaffney's maximum bonus was fifty per cent of his salary; McElroy's, Graff's, and Wormwood's bonuses were generally limited to 25 % of their salaries. Gaffney recommended bonuses for these three employees to Chelsea vice presidents, Freeman and Dunn, who followed his recommendation, and who recommended bonuses for Gaffney to Chelsea management.

[15] The master found that the land was neither necessary nor suitable for Ideal or any other division of the plaintiff.

sea's vice president Dunn, Gaffney denied that anyone else was involved with him in the joint venture. Gaffney also lied to vice president Freeman, telling him that Dube had left Ideal to go into business for himself. When Freeman questioned both Graff and Wormwood, they denied any knowledge of the defendants' actions and expressed their intentions to remain with Ideal.[16]

A few days after the defendants' resignations, Chelsea ordered them to leave Ideal's premises permanently, and commenced legal action against them. While giving a deposition in this action, Gaffney testified that Graff and Wormwood were participants in the joint venture, and both men resigned immediately.

Following these sudden resignations, Chelsea sent vice presidents Freeman, Dunn, and Axelrod to Ideal.[17] From December 5, 1977, to July 31, 1978, vice president Dunn spent one and half days a week, and Freeman spent a half day a week, at Ideal. For a period of six weeks, in December, 1977, and January, 1978, vice president Axelrod was at Ideal three days a week.

---

[16] Early in December, 1977, following the defendants' resignations, Chelsea agreed to increase Graff's and Wormwood's salaries as of January 1, 1978. Graff, aware of his own imminent departure, requested that their raises be made retroactive to October 1, 1977, and his request was granted. In the fall of 1977, Gaffney also instructed the comptroller to draw and distribute the bonus checks sooner than had been customary in prior years. On the day that Gaffney received his bonus checks, he went to the bank with the comptroller to convert Ideal's checks immediately into a cashier's check. Gaffney admitted he took these actions to insure early payment of the 1977 bonuses lest the defendants or their associates be "uncovered" before payment, and thereby lose their bonuses.

[17] Ronald Casty, Jr., Chelsea's vice president for administration, and one of its directors, also spent thirty-five days between December 1, 1977, and July 31, 1978, consulting with management personnel concerning problems at Ideal, and participating in all phases of this litigation. Chelsea also recalled its employee responsible for Ideal's international sales to take charge of all its sales. The master did not find that the plaintiff was entitled to recover the fair value of the services of these two persons.

1. *Liability for violations of their fiduciary duties.*[18]   At the hearing, Chelsea claimed that the defendants misappropriated their trade secrets, proprietary information, confidential information, and corporate opportunities.   The master found for the defendants on these issues.[19]   From those conclusions, the defendants assert that they had the right to plan and prepare for creation of a competing business while carrying on the normal duties of their employment and receiving compensation for their services without disclosing their plans to the plaintiff employer. The master concluded that the defendants could plan to "compete with Ideal, provided that in the course of such arrangements they did not otherwise act in violation of their fiduciary duties to the plaintiff."   We agree.

---

[18] The defendants argue that it was an abuse of discretion for the judge to refer the case to the master.  See Mass. R. Civ. P. 53 (b) (3), as appearing in 386 Mass. 1236 (1982); *Stockbridge* v. *Mixer,* 227 Mass. 501, 510 (1917).  See also *O'Brien* v. *Dwight,* 363 Mass. 256, 280 (1973). Therefore, the defendants claim we should grant them a new trial.  We do not agree.

"The main object of referring a suit to a master is to have the facts settled by him and to put the case in a position where nothing remains to be done except for the judge to apply the correct principles of law to the facts found."  *Shelburne Shirt Co.* v. *Singer,* 322 Mass. 262, 265 (1948).  See *Jet Spray Cooler, Inc.* v. *Crampton,* 377 Mass. 159, 164 n.7 (1979); *Peters* v. *Wallach,* 366 Mass. 622, 626 (1975).

In this case the master held his hearings promptly, and shortly thereafter made a full and careful report of the subsidiary facts and his conclusions.  A full transcript is before us, and the facts found are supported amply by the evidence.  Indeed, some of the subsidiary findings, which were struck by the judge, appear to us either clearly to be warranted by the evidence or to be based on the master's assessment of the witness's credibility.  The plaintiff did not appeal, and on appeal does not argue any error as to whether these findings in fact were supported by the evidence, and thence wrongly struck from the report.  Therefore, we do not discuss these issues.  See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975).

The defendants' claim for a new trial is nothing more than a request for a second bite of the apple on the issues of liability, and a third bite on the issue of damages.  See *infra* at 15.  There was no abuse of discretion in referring this matter to the master.

[19] The plaintiff has not appealed from these rulings, and therefore the correctness of these rulings is not before us.

The master found, however, that the defendants, as well as Graff and Wormwood, acted in violation of their fiduciary duties in the purchase of equipment for a price in excess of its fair market value, in the solicitation of Ideal's customers, in their preparation of a customer list and of an SBA loan application which included the names of prospective customers, most of whom were customers of Ideal, and in their agreement to leave Ideal simultaneously. He found that the defendants used the plaintiff's money for trips in the United States and Europe designed to benefit the defendants, not Ideal, and that they used work time for which Chelsea compensated them to plan their own venture. Further, the defendants permitted a "kickback" to be paid to one employee, and retained another employee, causing inadequate maintenance of Ideal's equipment and machinery. The findings indicated that the defendants permitted and recommended salary increases and maximum bonuses for disloyal employees. The defendants refused to obtain competent help for an Ideal salesman with an excellent record, thereby causing Ideal to lose the services of the salesman. In short, the record is replete with acts of disloyalty by these defendants toward Ideal.

Employees occupying a position of trust and confidence owe a duty of loyalty to their employer and must protect the interests of the employer. *Lincoln Stores, Inc.* v. *Grant,* 309 Mass. 417, 420-421 (1941). See Restatement (Second) of Agency § 387 (1958); *Lindsay* v. *Swift,* 230 Mass. 407, 412 (1918); *American Circular Loom Co.* v. *Wilson,* 198 Mass. 182, 206 (1908).

The master found that although none of the four joint venturers was an officer or director of Chelsea, they were trusted executives composing virtually all of Ideal's management. As such, they owed a fiduciary duty to Chelsea. See, e.g., *Hartford Elevator, Inc.* v. *Lauer,* 94 Wis. 2d 571, 580 (1980). Because he is bound to act solely for his employer's benefit in all matters within the scope of his employment, Restatement (Second) of Agency § 393 (1958); *Quinn* v. *Burton,* 195 Mass. 277, 279, 281 (1907); *C-E-I-R, Inc.* v. *Computer Dynamics Corp.,* 229 Md. 357, 366 (1961), an

executive employee is "barred from actively competing with his employer *during* the tenure of his employment, even in the absence of an express covenant so providing" (emphasis in original). *Maryland Metals, Inc.* v. *Metzner,* 282 Md. 31, 38 (1978). *Shulkin* v. *Shulkin,* 301 Mass. 184, 190 (1938). See *Raines* v. *Toney,* 228 Ark. 1170, 1179 (1958); *Hall* v. *Dekker,* 45 Cal. App. 2d 783, 786 (1941). The master's findings amply support the conclusion that the defendants violated their fiduciary duty of loyalty to Chelsea.[20] See, e.g., *Wormstead* v. *Town Manager of Saugus,* 366 Mass. 659 (1975).

2. *Forfeiture of the defendants' compensation.* Gaffney and McElroy contend that the judge erroneously awarded damages to the plaintiff equal to the entire compensation paid the defendants during the period they participated in a joint venture to compete with Chelsea. The defendants acknowledge that there is substantial authority in Massachusetts that a corporate officer, director, or trusted agent or employee can be required to forfeit the right to retain or receive his compensation for conduct in violation of his fiduciary duties. *Swaney* v. *Clark-Wilcox Co.,* 331 Mass. 471, 475 (1954). *Production Mach. Co.* v. *Howe,* 327 Mass. 372, 379 (1951). *Raymond* v. *Davies,* 293 Mass. 117, 120 (1936). *Little* v. *Phipps,* 208 Mass. 331, 334 (1911). *Sipley* v. *Stickney,* 190 Mass. 43, 46 (1906). They urge us, however, to conclude that their services were worth the total compensation they received.

Thus, the defendants urge us to follow those cases in which we have ordered a disloyal employee, after proving the value of his services, to repay only that portion of his compensation, if any, that was in excess of the worth of his services to his employer. *Anderson Corp.* v. *Blanch,* 340

---

[20] We leave open the issue of how long prior to termination an employee can plan his own business without informing his employer because, in this case, the employees Gaffney and McElroy planned their venture for two years prior to leaving, utilized the services of Graff for twenty months and Wormwood for approximately one year, and during the entire period acted in conflict with their employer.

Mass. 43, 51 (1959). *Walsh* v. *Atlantic Research Assocs.*, 321 Mass. 57, 66 (1947). Gaffney and McElroy urge that the judgment requiring them to forfeit all compensation was a "penalty disproportionately harsh under all the circumstances," see *Lydia E. Pinkham Medicine Co.* v. *Gove*, 303 Mass. 1, 6 (1939), and resulted in Chelsea's retaining the benefit of their valuable services without paying the agreed compensation for them. *Walsh* v. *Atlantic Research Assocs.*, *supra*.

The defendants argue that as business executives managing Ideal, their job was to produce profits for the plaintiff, and over a five-year period, during most of which they were in control of Ideal, it was a profitable company. Relying solely on Ideal's growth in sales and profits for this five-year period,[21] the defendants contend that they are entitled to retain the entire compensation they received while engaging in conduct disloyal to Chelsea.

The defendants' contention misconstrues the equitable nature of the remedy of restoration of compensation for employee breaches of the fiduciary duties of loyalty and diligence. Cf. *Sagalyn* v. *Meekins, Packard & Wheat Inc.*, 290 Mass. 434, 439 (1935). For such breaches, the defendants can be required to forfeit the right of compensation even absent a showing of actual injury to the employer. *Quinn* v. *Burton*, 195 Mass. 277, 279 (1907). See Restatement (Second) of Agency § 469 & comments (1958); *J.C. Peacock, Inc.* v. *Hasko*, 196 Cal. App. 2d 353, 358 (1961); *American Timber & Trading Co.* v. *Niedermeyer*, 276 Or. 1135, 1155 (1976). See also Jacobs, Business Ethics and The Law: Obligations of a Corporate Executive, 28 Bus. Law.

---

[21] The master found that Ideal lost $140,000 in profits in fiscal 1977. He also found that some of the loss was attributable to the defendants' disloyal conduct, but that several factors beyond the defendants' control contributed to Ideal's lost profits, such as adverse weather conditions, changes in shoe styles requiring less pressure sensitive tape, and a decrease in domestic shoe manufacture. Because he was unable to make a finding based on the evidence presented, as to how much of Ideal's loss was the defendants' responsibility, he denied Chelsea's claim that it should recover lost profits.

1063, 1084-1086 (1973). Further, the fact that Ideal made profits during the period in question "is no answer to the established violation of duty. The fact that the division may have made money does not prove that no breach took place." *Wilshire Oil Co.* v. *Riffe,* 406 F.2d 1061, 1062 (10th Cir. 1969). Consequently, unless Gaffney and McElroy proved the value of their services, Chelsea was entitled to recover their entire compensation. See *Harry R. Defler Corp.* v. *Kleeman,* 19 A.D.2d 396 (N.Y. 1963). We conclude that they did not prove the value of their services to Chelsea.

The master was unable to make a finding as to the worth of any services the defendants properly performed for Chelsea. Subsequently, the judge ordered the report recommitted to the master on Chelsea's claim to recover compensation paid the defendants, and concluded that they had not offered evidence at the initial hearings before the master as to the fair value of their services. He gave the defendants leave to present such evidence at the recommittal hearing, and placed the burden of persuasion on the defendants as to the fair value of their services. See, e.g., *First Nat'l Bank* v. *Brink,* 372 Mass. 257, 264 (1977), and cases cited.

The defendants' counsel at the time of the recommittal hearing, who was neither their trial counsel nor their counsel on this appeal, telephoned the master the day before the hearing, and then appeared at the scheduled hearing on March 18, 1981, to seek a continuance to May 1, 1981. The master said that in accordance with the order of reference to him, and the recommittal order, he had no authority to act on the motion for a continuance. See, e.g., Rule 49 (4) of the Rules of the Superior Court (1978) ("master . . . shall grant no adjournment for a longer period than seven (7) days except by order of the court"). See Mass. R. Civ. P. 53 (f) (1), as appearing in 386 Mass. 1236 (1982). The defendants' counsel at that time agreed to the master's suggestion that he bring his motion for a continuance before a judge, and that the master would prepare a report stating that no

evidence had been presented. The master held this report in abeyance pending the disposition of the motion.

Neither Gaffney, McElroy, nor their counsel, appeared at the scheduled hearing on their motion for a continuance. The master then filed his supplemental report, in which he found that no evidence had been presented on the fair value of the defendants' services to Chelsea, the defendants had failed to meet their burden of persuasion, and no determination of such fair value was possible. After a hearing, the judge confirmed and adopted the original and supplemental reports and entered judgment which, among other items, awarded Chelsea repayment by the defendants of the entire compensation they received during the period of their joint venture.

Gaffney and McElroy were given not one, but two, opportunities to present evidence as to the fair value of their services. By ordering a recommittal hearing, the judge gave them an opportunity which they failed utterly to utilize. Under Mass. R. Civ. P. 53 (f) (6), as appearing in 386 Mass. 1236, 1240-1241 (1982), if a party fails to appear at a scheduled hearing, the master "may proceed ex parte or, in his discretion, adjourn the proceedings to a future day." See *Charles E. Burt, Inc.* v. *Seven Grand Corp.*, 340 Mass. 124, 126 (1959). See generally Greaney, Trials Before Masters: A Procedural and Substantive Primer For the Practicing Lawyer, 63 Mass. L. Rev. 195 (1978).

The master did not abuse his discretion by proceeding ex parte, particularly where it was the defendants' own failure to present evidence at the recommittal hearing and to appear at the hearing on the motion for a continuance that resulted in the finding that they had failed to present any evidence showing the value of their services to Chelsea. See, e.g., *Jet Spray Cooler, Inc.* v. *Crampton*, 377 Mass. 159, 174 n.14 (1979); *Analogic Corp.* v. *Data Translation Inc.*, 371 Mass. 643, 649 (1976). The judge also properly entered judgment on the report. See, e.g., *Charles E. Burt, Inc.* v. *Seven Grand Corp., supra.* Cf. *Tartaglia* v. *Del Papa*, 48 F.R.D. 292 (E.D. Pa. 1969).

The defendants make the bare assertion that from the record we can conclude that the value of their services was equal to the amount of compensation they received. See, e.g., *Black* v. *Parker Mfg. Co.*, 329 Mass. 105, 116 (1952). There was nothing before the judge nor before us which would have enabled him or us to determine the value to Chelsea of any services properly performed by the defendants. Further, there are no "special circumstances" which would cause us to give the defendants a third opportunity to present this claim. Cf. *Strong* v. *Merchant Mut. Ins. Co.*, 366 Mass. 751, 753 (1975); *Entrialgo* v. *Twin City Dodge, Inc.*, 368 Mass. 812, 813 (1975).

3. *Repayment by the defendants of compensation paid to Graff and Wormwood.* The defendants recruited and utilized the services of Graff and Wormwood for their enterprise. The findings show that Gaffney recommended substantial salary increases and bonuses for these two employees, although he was fully aware of their disloyal conduct, and their plans to leave en masse with the defendants when the new business was operational. By failing to disclose information they possessed, contrary to Chelsea's interests, the defendants were directly responsible for Chelsea's paying salaries, salary increases, and bonuses to Graff and Wormwood in return for services performed for them at Chelsea's expense. "[D]irectors and officers of a corporation are jointly as well as severally liable . . . if they jointly participate in the breach of fiduciary duty or approve of, acquiesce in or conceal a breach by a fellow director or officer." 3 W. Fletcher Cyclopedia of Corporations § 1002 (rev. perm. ed. 1975). See *Lawson* v. *Baltimore Paint & Chem. Corp.*, 347 F. Supp. 967, 977-978 (D. Md. 1972). See also *Aero Drapery of Ky., Inc.* v. *Engdahl*, 507 S.W.2d 166, 169 (Ky. 1974). See Restatement (Second) of Agency § 405 (2) (1958). This rule applies to the defendants who were executive officers of Chelsea. The master found that the defendants approved, concealed, and acquiesced in Graff's and Wormwood's violation of their fiduciary duties to Chelsea.

Further, the defendants were not ordered to make restitution to Chelsea of another employee's salary. Rather, they were ordered to compensate Chelsea for the services which they utilized for their new business. See *Lawson* v. *Baltimore Paint & Chem. Corp.*, 347 F. Supp. 967, 977 (D. Md. 1972). The judge did not err in awarding to Chelsea, as an element of damages, the compensation paid to Graff and Wormwood during the period they worked for the defendants' own venture.[22] The services of Graff and Wormwood benefited the defendants, not Chelsea. Therefore, the defendants were properly ordered to repay Chelsea for the services that they took from Chelsea.

4. *Recovery for the fair value of the services of three Chelsea executives.* The judge awarded Chelsea $58,792 "[f]or cost of special services by Dunn, Freeman and Axelrod." These three Chelsea executives along with vice president Casty devoted substantial time to Ideal's management at the expense of their normal responsibilities for Chelsea's

---

[22] The defendants urge us to conclude that the judge erred in awarding interest on the compensation paid to the defendants and to Graff and Wormwood as an element of damages. The defendants press each of these claims in two separate paragraphs of their brief. The only case cited by the defendants is *Winchell* v. *Plywood Corp.*, 324 Mass. 171 (1949). *Winchell* is correctly cited by the defendants as standing for the general proposition that "when money is not paid when due the plaintiff is entitled to interest, by way of damages, from the time when it should have been paid." *Id.* at 181. As we read the master's report, however, he awarded interest on the theory that the defendants were not entitled to any money from Chelsea, and that interest therefore was awarded for the defendants' use of Chelsea's money during the time in which they were not acting in Chelsea's best interests.

The defendants do no more than state as an issue that the awarding of interest was error and ask that the award be reversed. This is an insufficient argument. Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975). *Tobin* v. *Commissioner of Banks*, 377 Mass. 909 (1979). See, e.g., *Olsson* v. *Waite*, 373 Mass. 517, 521 (1977). See also *Lolos* v. *Berlin*, 338 Mass. 10, 14 (1958). Further, our cases have awarded interest when a plaintiff has recovered the amount of compensation paid to a disloyal employee, officer, or director. See, e.g., *Anderson Corp.* v. *Blanch*, 340 Mass. 43, 52 (1959); *Production Mach. Co.* v. *Howe*, 327 Mass. 372, 379 (1951). The defendants make no attempt to distinguish these cases or to cite authorities in favor of their position.

operations, following Graff's, Wormwood's, and the defendants' precipitous departures.

The defendants claim that the judge erred in allowing recovery of these costs because Chelsea would have spent far more if the four departing employees had remained with Ideal. The defendants' principal contention, however, is that they should not be liable for any of these costs to the plaintiff for the three executives' services because they and their associates were employees at will. As such, Chelsea was free to discharge them at any time, and the defendants were free to leave at any time without incurring liability for compensation paid to their replacements. Cf. *Fortune* v. *National Cash Register Co.*, 373 Mass. 96, 100-101, 102 (1977); *Askinas* v. *Westinghouse Elec. Corp.*, 330 Mass. 103, 106 (1953); *Mechanics Foundry & Mach. Co.* v. *Lynch*, 236 Mass. 504, 505 (1920).

The defendants' arguments, however, ignore that the master found that the plaintiff incurred these expenses as a result of the serious disruption and damage to Ideal's business and operations, which was a "direct consequence of the breaches of fiduciary duty by the defendants and their associates as executives at Ideal." Therefore, the plaintiff had to utilize its three executives at Ideal to mitigate the damage already done and to minimize future damage from the defendants and their associates, and to locate and train their replacements. Chelsea is entitled to be compensated for the value of the services these executives otherwise would have dedicated to other aspects of Chelsea's business. Since Chelsea used employees who ordinarily would have been engaged in activities designed to make a profit to repair the harm the defendants' misconduct caused Ideal, Chelsea was entitled to its reasonable expenses. See *Dahlstrom Metallic Door Co.* v. *Evatt Constr. Co.*, 256 Mass. 404, 416-417 (1926).

The reasonable value of these services is properly measured by the "salaries of the officers and employees and the time which they would otherwise have spent on other work" for the plaintiff. *Bowl America Inc.* v. *Fair Lanes*,

*Inc.,* 299 F. Supp. 1080, 1097 (D. Md. 1969). Consequently, we find no error in allowing the plaintiff to recover the costs of these services as damages.[23]

The defendants also contest the judge's computation of $58,792 for the cost of the special services of these three Chelsea executives. Although the judge allowed recovery for the services of Dunn, Freeman, and Axelrod in par. (1) (a) of the final judgment, the dollar amount of recovery he allowed Chelsea for those services differs from their value as computed by the master, which was $47,519.

We agree with the defendants that these differences are inexplicable. We conclude that the judgment should be modified so as to reflect the master's recommendation that Chelsea be compensated for the fair value of Dunn's, Freeman's, and Axelrod's services, but not for the fair value of Casty's services.[24] Therefore, the fair value to Chelsea of these executives' services should be reduced by $11,273.

---

[23] Chelsea also was entitled to recover the costs of these services as the cost of training replacements because the defendants, who were in a relation of confidence with the plaintiff, interfered with Chelsea's relations with its two employees, Graff and Wormwood. Therefore, Chelsea is entitled to recover damages for the "cost of training replacements for those enticed by defendants." *Frederick Chusid & Co.* v. *Marshall Leeman & Co.,* 326 F. Supp. 1043, 1060-1061 (S.D. N.Y. 1971). Cf. *BBF, Inc.* v. *Germanium Power Devices Corp.,* 13 Mass. App. Ct. 166, 176 (1982) (plaintiff did not produce evidence of the cost of training or finding replacements for fellow employees enticed away by the defendants).

[24] The master concluded that the fair value of these executives' services were as follows: Dunn $33,150; Freeman $8,177; Axelrod $6,192; and Casty, $17,465. He concluded that Chelsea should not recover for Casty's services. Even if we were to disagree with the master and conclude that Chelsea also should be compensated for Casty's services, Chelsea's failure to file a cross-appeal precludes it from obtaining a judgment more favorable than the judgment entered below. See *Boston Edison Co.* v. *Boston Redevelopment Auth.,* 374 Mass. 37, 43 n.5 (1977), and cases cited.

The judgment also should be modified to correct some computation errors.[25]  As so modified, the judgment is affirmed.

*So ordered.*

---

[25] It appears that some of the computations resulted in certain minor mathematical errors.  First, McElroy's total compensation for 1976 should be $20,278, rather than $20,279.  Second, in the master's subsidiary findings of fact, the salaries and fringe benefits for Gaffney, McElroy, and Graff for 1977 total $122,785, rather than the $130,335 amount in the master's conclusion.  Third, compensation for Graff and Wormwood for fiscal 1978 should be $9,305, rather than $12,013.  Fourth, the master's separate calculation of the interest on the bonuses paid to the four employees for 1976 and 1977 should be $16,118.41, rather than $16,118.44.