Hinkle, MargaretR., J.
On February 21,2002, after a seven-week trial, a jury found that Lars Bildman (“Bildman”) defrauded Astra USA, Inc. (“Astra” or “Astra USA”) and converted Astra funds. For this conduct, the jury awarded Astra $875,512 in damages.* The jury also found that Bildman wasted the assets of Astra, causing Astra $1,040,812 in damages. Further, the jury found that Bildman breached his fiduciary duly to Astra by making affirmative misrepresentations while he was its President and CEO, failing to disclose material information he had a duty to disclose, and improperly using Astra funds. The jury found that this conduct was a substantial factor in causing harm to Astra, and, as a result, Astra was entitled to $ 1,040,812 in damages. The jury found that its damages awards overlapped, and that, without overlapping, Astra was entitled to a total of $1,040,812 in damages from Bildman. The jury also found that Bildman engaged in sexual harassment, violated Astra’s sexual harassment policy, and retaliated against one or more Astra employees who exercised their right to make a complaint under Astra’s sexual harassment policy.[3] The jury made other findings not relevant to the equitable forfeiture matter pending before the Court.
At trial I reserved on Astra’s equitable forfeiture claim. Now, following a bench trial on that claim,[4] I make the following findings of fact and rulings of law.

Findings of Fact

1. At all relevant times, Astra AB was a Swedish pharmaceutical company, publicly traded on the New York Stock Exchange. By the 1990s, Astra AB had become the fastest growing drug company in the world. Astra AB had subsidiary companies throughout the world, including research companies, which developed new drug products, and marketing companies, which marketed and sold Astra products. The subsidiaries and Astra AB constituted what was often referred to as the “Astra Group.”
2. Astra AB also had independent licensees around the world, to which Astra AB licensed the rights to sell its products in certain markets. The licensees were typically competitor drug companies with which Astra AB teamed to sell its products. Under licensing arrangements, Astra AB shared with the licensee the revenue received upon the sale of the product.
3. The world pharmaceutical market consists of generic multi-source and patented single-source products. Sales of single-source patented products typically have higher gross margins than sales of generic multi-source products.
4. Astra AB is a research-intensive company with a product portfolio dominated by high-margin patented drugs.
5. At all relevant times, the United States was the biggest pharmaceutical market in the world. The prescription drug market in the United States has two primary sectors: the hospital sector and the outpatient or office-based physician sector, also referred to as the general practitioner market (“the GP market”). At relevant times, the hospital sector represented about 10 *582 percent of the total American prescription drug market, with the remaining 90 percent in the GP market.
6. In the American market, Astra AB previously out-licensed all its major patented drugs aimed at the GP market. In particular, in the early 1980s, Astra entered into a license agreement with Merck which gave Merck the exclusive first right to all Astra AB original research products in the GP market in the United States. This agreement was known as the Astra-Merck joint venture.
7. Throughout the 1980s and 1990s, Astra USA was unable to sell any Astra AB patented drugs in the United States unless the licensee chose not to exercise its right to sell a particular drug. Thus, Astra USA was limited to multi-source generic products, with low margins, in the hospital sector.
8. Lars Bildman served as President and Chief Executive Officer of Astra USA, Inc. (“Astra”) from 1991 though his termination in 1996. Bildman began his employment at Astra AB in 1972. In 1976, he became Vice President of Administration and Finance for Astra Germany, where he was promoted to Executive Vice President in 1979.
9. In 1980, Bildman was asked by the then-President and CEO of Astra AB to become President and CEO of Astra Pharmaceuticals, the American subsidiary of Astra AB, which later became Astra USA, Inc. At this time, the U.S. subsidiary was the only Astra AB subsidiary operating at a loss.
10. After Bildman became President and CEO of Astra, he made significant management changes: he brought in a new management team, implemented a new business strategy, and laid off almost half the work force.
11. Around 1988, Hakan Mogren (“Mogren”) was appointed President and CEO of Astra AB. Among other things, Mogren reorganized Astra AB’s subsidiaries into geographical regions with Astra USA becoming a part of the “Americas” region.
12. Around this time, Astra AB’s goal became expansion of its presence in the United States GP market through its own sales organization rather than through license agreements. Mogren established a special task force, which included Bildman, to investigate different ways to achieve independence from licensees in the United States market.
13. The task force investigated different strategies for achieving a wholly-owned presence in the GP market and determined among other things, that a marketing and sales organization and resources for medical and clinical research were critical to expansion.
14. To that end, Mogren directed task force members to initiate talks with Merck to learn whether Merck had any interest in dissolving its joint venture with Astra, and, if so, at what price.
15. The task force investigated alternatives for expansion into the GP market, including: (1) out-licensing of future original Astra AB research products through licensees; (2) acquisition of a company already present in the GP market with a large sales force; or (3) internal organic growth of a new sales force and marketing organization with research capabilities.
16. Mogren rejected the out-licensing alternative because it would not provide Astra a complete payback on its research investments.
17. For fiscal reasons, Mogren also rejected the acquisition alternative.
18. Mogren formally adopted a new strategic mission for Astra AB in the United States to develop a new outpatient division to penetrate the GP market. The directors of both Astra AB and Astra USA approved this strategy.
19. As a result of this strategy, unlike all other Astra subsidiaries, Astra USA’s strategic mission for the period 1991 to 1996 was less to contribute financially to its parent and more to create a new organization prepared to launch Astra AB high-margin research products in the local GP market.
20. To implement Astra AB’s new United States strategy, Astra USA organized its operation into two divisions: the Hospital Division, which conducted business in the traditional hospital market, and a new Rx Division, to conduct business in the larger, more profitable GP market.
21. Astra AB recognized that the expansion of the Rx Division in the U.S. would negatively impact the consolidated total financial contribution reported by Astra. The Astra Group used the term “total contribution” in its financial reporting as a measure of subsidiary profitability. Total contribution is essentially the equivalent of gross profit.
22. Astra AB decided to finance development of the Rx Division largely through revenues generated by the Hospital Division. In 1991, Astra USA launched development of the Rx Division, using capital from the Hospital Division.
23. Building the Rx Division required hiring and training an entire new sales force to conduct office-based sales. The plan was to build a sales force of about 500 individuals in the Rx Division by 1995. To that end, Astra USA recruited and built a national sales force and implemented new sales and marketing strategies.
24. Around this time, Astra USA decided to launch the sale of two generic drugs, Toprol-XL and Rhinocort Aqua, in the GP market to prepare the sales force for the major anticipated launch of Pulmicort Turbuhaler (“Pulmicort”). Pulmicort was a highly-successful patented research drug of Astra AB, which its subsidiaries in other world markets had been successfully selling throughout the early 1990s.
*583 25. Since Merck had decided not to sell Pulmicort in the United States, it was available to Astra USA to sell in the United States market, but Astra USA lacked a sales force to sell the product. ,
26. Although the Hospital Division continued to generate significant revenue, the consolidated total contribution of Astra USA to Astra AB was near zero from the start-up of the Rx Division. Astra AB’s objective was to have the Rx Division begin to generate a positive cash flow through Pulmicort Turbuhaler.
27. In its 1991-96 Annual Reports, Astra AB advertised creation of the new Astra USA Rx Division and anticipated a major launch of Pulmicort Turbuhaler within that division.
28. Each year, Astra AB subsidiaries generated a Marketing Company Plan in which each subsidiary outlined its business strategy for the next three years, with the first year as a budget, and reported financial and sales performance for the prior year.
29. From 1991 to 1996, each budget and Marketing Company Plan for Astra USA included projections for the Rx Division and implemented the new strategy for Astra USA in the local market.
30. Every budget and plan for each division and the consolidated plan for Astra USA reflected this agreed-upon financing arrangement for the Rx division. The Astra AB and the Astra USA directors reviewed and approved all Marketing Company Plans and budgets, which included projected losses for the Rx Division for its first years until the launch of Pulmicort Turbuhaler, and a lowered consolidated total contribution by Astra USA.
31. Astra USA’s overhead costs increased with the development of the Rx Division, which impacted Astra USA’s profit and consolidated total contribution.
32. Astra USA’s contribution to Astra AB, which was 2% of Astra AB’s net profit in 1991, declined to only .6% by the end of 1995. Even though Astra USA’s sales increased during this period, its growth lagged behind that of the Astra Group as a whole from 1991 to 1995. Astra USA’s net profit was essentially the same at the end of 1995 (105 million Swedish Kroner) as it had been at the end of 1991 (102.9 million Swedish Kroner). This contrasted with the growth in profitability of other Astra AB subsidiaries.
33. In the 1990s, Astra AB launched a patented drug called Losec. By the mid-1990s, Losec was the most profitable drug sold by Astra AB and, at one point, the world’s largest selling drug. During 1991 to 1996, Merck had exclusive rights to sell Losec in the United States under its joint venture agreement with Astra. In its Annual Reports, Astra AB reported that the profitability of its subsidiaries was a direct result of the sale of Losec. Stated variously, the subsidiaries which out-performed Astra USA in total contribution during 1991 to 1996 had access to Losec, and Astra USA’s inability to sell Losec hampered its total contribution.
34. Under Bildman’s tutelage, Astra USA became profitable in three years and reestablished its position in the local anesthetics market. At the time, the local anesthetic world market was dominated by three Astra AB products: Xylocaine, Marcaine, and Carbocaine. Of these products, Astra USA had the right to sell only Xylocaine. Unlike all other Astra AB subsidiaries, Astra USA had no access to Marcaine and Carbocaine because Astra AB had out-licensed Marcaine and Carbocaine in the United States to Astra USA’s major competitor.
35. Astra USA’s market shares for all its major hospital products grew during 1991-96. Despite being restricted to selling mainly generic local anesthetics, Astra USA continued to grow in market share.
36. However, Astra USA’s share in the so-called local anesthetics market was lower than the share of the local anesthetics market of Astra AB as a whole and less than that of numerous Astra AB subsidiaries. Put another way, Astra AB’s share of the local anesthetics market in the world, and the share of numerous Astra AB subsidiaries in their respective local anesthetic market, was considerably greater than Astra USA’s share of the American local anesthetics market.
37. In the new Rx Division, Astra USA successfully launched two products in the GP market during 1991 to 1996 for training purposes. In 1992, Astra USA launched Toprol- XL and in 1994, Astra USA launched Rhinocort Aqua. Toprol-XL and Rhinocort were generic versions of products previously in the United States market.
38. By 1995, both Rhinocort and Toprol-XL showed growth in their respective market segments and increased revenues significantly. At the same time, the Hospital Division continued to be profitable for Astra USA with increased market share and profits.
39. As conceded by Bildman, the Rx Division lost money each year.
40. During 1991 to 1996, Astra USA met or exceeded its financial commitments to the Astra Group outlined in the Marketing Company Plans and budgets.
41. In its Annual Reports during 1991 to 1996, Astra AB praised the growth and performance of Astra USA.
42. In the 1991 Annual Report, Astra AB reported that the trend for the Hospital Division of Astra USA was “highly favorable” with a 30% increase in sales.
43. In the 1992 Annual Report, Astra AB reported that Astra USA’s sales rose 19%, with sales in the local anesthetic group adversely affected by changes in product range.
*584 44. In the 1993 Annual Report, Astra AB reported that sales at Astra USA rose 20%, attributed in part to the early success in the sales of Toprol-XL.
45. In the 1994 Annual Report, Astra AB reported that sales at Astra USA rose 13%, and noted the successful launch of both Toprol-XL and Rhinocort in the Rx Division.
46. In the 1995 Annual Report, Astra AB reported that Astra USA had been strengthened by the addition of the Rx Division and successful launches of ToprolXL and Rhinocort. Astra AB reported “rapid development” for Astra USA in 1995, with Toprol and Rhinocort leading growth in their respective market segments.
47. In the 1996 Annual Report, Astra AB again reported rapid growth of Astra USA with the successful launches of Toprol-XL and Rhinocort. The report also anticipated the launch, of Pulmicort through the Rx Division.
48. Neal Tully, Secretary to the Astra USA Board of Directors from 1991-1996, testified that Mogren and other Astra AB executives consistently praised Bildman for the success of Astra USA. I credit that testimony and conclude that Bildman’s tenure at Astra USA was highly successful with the exception of the serious matters that gave rise to his termination and this litigation.
49. Louis Lasagna, Chairman of the Astra USA Board of Directors during the relevant time period, often praised Bildman for his leadership of Astra USA. For example, at the directors’ meeting held on December 6, 1995, at which Mogren was present, Lasagna stated that Bildman and his management team had completed “a tremendous year.”
50. By 1995, Astra USA had successfully built the Rx Division and was ready to market and sell Pulmicort Turbuhaler once that drug was approved by the FDA.
51. Astra USA had budgeted and planned to launch Pulmicort Turbuhaler as Astra AB’s first major drug marketed by a wholly-owned Astra subsidiary on the American market without a local marketing and sales partner.
52. However, in early 1995, the FDA denied Astra’s application for Pulmicort largely because, in the application, Astra AB submitted test results from a different product to support the application. As a result, Pulmicort was not brought to market during Bildman’s tenure.
53. At the time of Bildman’s suspension in 1996, the net profits of Astra AB subsidiaries operating in smaller markets than Astra USA exceeded those of Astra USA. For example, Astra Belgium’s net profits were three times greater than those of Astra USA; Astra Netherlands and Astra Australia generated net profits eight times greater, and Astra Germany’s net profits were 22 times greater. Astra USA’s relative performance was largely attributable to the other subsidiaries’ ability to sell Losec, which, as noted, Astra USA could not sell, and to the fact that other subsidiaries were able to bring the Pulmicourt Turbuhaler to market.
54. Around 1985, Astra AB instituted a world-wide profit sharing plan. Each subsidiary was provided grants based upon the number of employees. The funds allocated to each subsidiary were based upon the financial performance of Astra AB and not that of the subsidiary. Each subsidiary CEO had authority to use the funds in a manner best fitting his company’s overall goals, recognizing local conditions.
55. In contrast to all other participating subsidiaries, Astra USA under Bildman permitted all employees at Astra USA to share equally in its profit sharing plan. Thus, Bildman received a smaller grant than any other CEO of the Astra Group. Each employee of Astra USA received yearly payments as a participant in the profit sharing plan. This plan was not dependent upon the performance of individual employees or individual subsidiaries.
56. Beginning in 1981, Astra USA, with the approval of Astra AB, implemented an annual bonus for the entire management team of Astra USA, including Bildman. This bonus program was in effect through 1996. The Astra USA bonus program was based on the performance of Astra USA, and not on individual performance.
57. After discussions and agreement with Bildman, Astra AB set the yearly performance goals for Astra USA and the corresponding size of the bonus pool. Astra AB also established Bildman’s share in the bonus pool.
58. Bildman received a bonus for each year that Astra USA exceeded its bonus targets. During the period 1982 to 1996, only in 1987 did Astra USA fail to achieve the yearly target of Astra AB.
59. Around 1991, Astra USA began exploring implementation of a long-term stock grant program to attract management-level employees.
60. Astra USA and Astra AB retained executive consultants to analyze Bildman’s compensation in conjunction with the stock plan review.
61. Attorney Tully, Astra USA’s board secretary, reported to Astra AB that although Bildman’s short-term compensation (salary and bonus) was within 10% of industry standards, Bildman’s overall compensation was not competitive with similar executives and was 50% less than industry standards due to the lack of a long-term plan.
62. In or around 1993, Astra AB implemented a long-term compensation program at Astra USA using grants of Astra AB stock. Under this program. Astra AB granted Bildman shares of Astra AB stock according to a vesting schedule. Due to his termination Bildman did not receive his entire long-term compen *585 sation. He forfeited 3,275 shares of Astra AB stock granted in 1996, 4,767 shares granted in 1995, 5,439 shares granted in 1994, and 3,770 shares granted in 1993.
63. In addition to serving as CEO and President of Astra USA, Bildman also served as a director of Astra USA and Astra Germany.
64. In 1991, Astra paid Bildman a total of $928,751.60, including a bonus of $300,000. In 1992, it paid him $893,098.18, including a bonus of $300,000. In 1993, it paid him $955,348.56, including a bonus of $200,000. In 1994, it paid him $848,824.61, including a bonus of $180,000. In 1995, it paid him $1,028,583.75, including a bonus of $200,000. In 1996, it paid him $944,490.50, and awarded him a supplemental stock grant valued at $203,691 in March of that year.

Rulings of Law

Because of the jury findings in favor of Astra on its breach of fiduciary duty claim, Astra now seeks equitable relief in the form of forfeiture of Bildman’s compensation for the years 1991 through 1996. This Court previously ruled that Massachusetts’ three-year limitations period for breach of fiduciary duty claims applies to Astra’s forfeiture claim. However, because Bildman failed to plead a statute of limitations defense in his answer or amended answer, I find and rule that he has waived this defense. See Mass.R.Civ.P. 8(c).
Because Astra is a New York corporation, New York law governs its claim for forfeiture. See Harrison v. NetCentric Corp., 433 Mass. 465, 470-71 (2001) (law of state of incorporation governs matters relating to internal affairs of corporation, including breach of fiduciary duty). Under New York law, an individual who owes a duty of fidelity to a principal and is faithless in the performance of his services is generally disentitled to recover his compensation, whether or not his services benefitted the principal and even if the principal suffered no damages by reason of his breach of duty. Royal Carbo Corp. v. Flameguard, Inc., 645 N.Y.S.2d 18, 19 (N.Y. A.D. 2 Dept. 1996); Feiger v. Iral Jewelry, Ltd., 394 N.Y.S.2d 626, 626 (N.Y. 1977); Lamdin v. Surface Advertising Corp., 272 N.Y. 133, 138 (N.Y. 1936).
In a May 4, 2005 Memorandum of Decision [19 Mass. L. Rptr. 368], this Court recognized that Astra may be entitled to forfeiture of Bildman’s salary and bonuses during his period of disloyalty, depending on my findings and rulings in this decision. A fiduciary is generally required to repay only the portion of his compensation in excess of the worth of his services. See Meehan v. Shaughnessy, 404 Mass. 419, 440 (1989); Chelsea Industries, Inc. v. Gaffney, 389 Mass. 1, 14 (1983). “This limitation stems from the premise that the forfeiture remedy is not a penalty but really reimbursement of payment for services not properly performed . . . Therefore, compensation is often apportioned in relation to the services indeed properly performed.” In re Tri-Star Technologies Co., Inc., 257 B.R. 629, 636 (Bankr.D.Mass. 2001). See Anderson Corp. v. Blanch, 340 Mass. 43, 51 (1959); Lydia E. Pinkham Medicine Co. v. Gove, 303 Mass. 1, 4 (1939).
The fiduciary bears the burden of proving the fair value of his services during the time he engaged in disloyal conduct; if he fails to do so, it is appropriate to forfeit his entire compensation. See Chelsea Industries, Inc. v. Gaffney, 389 Mass. at 14. The extent of equitable forfeiture of compensation is left to the sound discretion of the trial court, with reference to the peculiar factors found to be present in the case, including the nature of the conduct and whether the breach was egregious, whether the breach caused actual injury to the corporation, and the extent to which the improper activities diverted the fiduciary’s time and energy from his corporate responsibilities. See Anderson Corp. v. Blanch, 340 Mass. at 50-51; Production Machine Co. v. Howe, 327 Mass. 372, 378-79 (1951); In re Tri-Star Technologies Co., Inc., 257 B.R. at 637 & n. 10.
Here, Bildman’s breach of fiduciary duty constitutes serious misconduct. In weighing the equities, however, this court considers that some of Bildman’s unsavory behavior may have been in keeping with Astra’s corporate culture at the time in question, and tolerated, at least for a time, by the directors. See Design Strategies, Inc. v. Davis, 384 F.Sup.2d 649, 661-62 (S.D.N.Y. 2005) (noting that one line of cases under New York law suggests that disloyal employee need not forfeit promised compensation when misconduct does not substantially violate contract of service, and disloyally may not be substantial where it consists of single act or where employer knew of and tolerated the behavior).
As found by the jury, Bildman’s breach of fiduciary duty caused actual injury to Astra, for which the company was compensated by thé jury’s award of more than a million dollars in damages. Astra argues that in measuring the magnitude of the harm Bildman caused, this court should include the $905,080.06 paid by Astra’s Board of Directors to the law firm of Winthrop Stimson to investigate Bildman’s misconduct after the Board learned in April of 1996, through a Business Week article, that some Astra employees alleged sexual harassment by Bildman and other senior managers. This Court agrees, without delving into the particulars, that the fact that Astra was forced to spend time and money investigating Bildman is harm to be considered in weighing the equities of forfeiture.[5]
However, I am unpersuaded that Bildman’s conduct was a substantial factor in causing Astra harm with respect to Astra’s settlement with the Equal Employment Opportunity Commission (“EEOC”). On *586 February 5, 1998, the EEOC filed a complaint against Astra, alleging, among other things, that “Astra management officials, including but not limited to, Lars Bildman and George Roadman, used their authority and positions in the Company to engage in . . . sexual harassment,” and that Astra under Bildman maintained a “hostile work environment.” On February 5, 1998, the EEOC and Astra entered into a Consent Decree, approved by a local federal judge. Under the Consent Decree, Astra paid $9.85 million into a fund to be used to pay individuals who demonstrated to a Special Master that they had claims against Astra for sexual harassment. The Special Master was appointed to review the claims, determine eligibility for payment under the terms of the Consent Decree, and make awards. The Special Master did not conduct evidentiary hearings on the claims or contact Bildman or others whose conduct formed the basis of these claims to contest the claims if they desired. Therefore, it would be unfair for this Court in this litigation to use the EEOC settlement as evidence of Bildman’s harm to Astra, particularly since Astra concedes that the Consent Decree did not constitute an adjudication of the validity of the claimants’ allegations against Bildman. Accordingly, I do not consider the EEOC settlement as harm caused by Bildman in weighing the equities of forfeiture.
Another relevant consideration is the extent to which the improper activities diverted the fiduciary’s time and energy from his corporate responsibilities. Here, I find and rule that Bildman’s breach of fiduciary duty did not substantially divert his time or energy from Astra, cause his productivity to wane, or affect the normal operations of Astra. See Meehan v. Shaughnessy, 404 Mass. at 440 (no forfeiture where attorneys who were secretly preparing to compete with their firm and unfairly took clients with them were as productive during period of breach as they had always been). Rather, I conclude that Bildman at all relevant times worked primarily to advance Astra’s interests and that he successfully implemented Astra’s business strategy for the period from 1991 to 1996. Cf. Aramony v. United Way of America, 28 F.Sup.2d 147, 176 (S.D.N.Y. 1998), aff'd in part, rev’d in part on other grounds, 191 F.3d 140 (2d Cir. 1999) (President/CEO of United Way convicted of embezzlement had to forfeit $951,250 in salary paid while he breached fiduciary duty; although he was responsible for United Way’s rise to prominence during that period, his fraudulent diversion of assets squandered millions of dollars in contributions intended to benefit neediest members of society, undermining non-profit’s mission and possibly damaging public confidence).
Weighing the relevant factors, and without minimizing the serious breach of fiduciary duty committed by Bildman, this Court concludes that Bildman has met his burden of proving the fair value of his services during the period from 1991 through 1996, and that he earned his compensation in each of those years despite his breach. Cf. Boston Children’s Heart v. Nadal-Ginard, 73 F.3d 429, 436 (1st Cir. 1996) (forfeiture of compensation warranted where fiduciary did not establish value of his services because evidence was speculative, conflicting, and relied on self-aggrandizing statements). Bildman’s breach of fiduciary duty did not negate his otherwise proper performance as President and CEO of Astra USA, and the forfeiture of salary now sought by Astra would impose a penally on Bildman which I conclude would be disproportionately harsh under all the circumstances. This Court, in its discretion, therefore rules that Astra is not entitled in equity to reimbursement of the salary paid to Bildman during the relevant period, insofar as he earned that salary by providing valuable services despite his breach of fiduciary duty.
Lastly, the bonuses paid to Bildman between 1991 and 1995 were compensation based not on his individual performance but on the performance of Astra USA. As discussed above, under Bildman’s leadership Astra USA succeeded in its mission to launch the Rx Division. Given the undisputed evidence that Astra USA met its performance goals in the years at issue, I conclude that Bildman has satisfied his burden to show that he provided valuable services and earned his bonuses. Accordingly, despite Bildman’s serious breach of fiduciary duty, Astra is not entitled in equity to reimbursement of the bonuses paid to Bildman between 1991 and 1995.

ORDER

Based on the foregoing findings of fact and rulings of law, it is hereby ORDERED that Astra USA, Inc., is not entitled to equitable forfeiture of the salary and bonuses paid to Lars Bildman between 1991 and 1996.

 These findings were not made in the context of Astra’s fiduciary duty claim.

 Editor’s Note: For other reported opinions in this matter see 19 Mass. L. Rptr. 368, 13 Mass. L. Rptr. 686, and 13 Mass. L. Rptr. 300.

 With the parties’ consent, direct examination of all live trial witnesses except Neal Tully, Esq. was presented by affidavit.

 This Court rejects, however, any renewed attempt by Astra to recover the costs of the investigation as damages, an offset, or otherwise. This Court has addressed that issue on several prior occasions.