Kenton-Walker, Janet, J.
This is an action brought by Inner-Tite Corporation (“Inner-Tite”) against its former employee, William Brozowksi (“Brozowski”). Brozowski left the employ of Inner-Tite in October 2009 and began employment with Highfield Manufac *205 turing Company (“Highfield”), a direct competitor of Inner-Tite.[1] Inner-Tite claims Brozowski has breached the secrecy and non-compete agreement he signed with Inner-Tite, and has also breached his fiduciary duty to his former employer. Brozowski denies these claims.
At the outset of this case, Inner-Tite sought a temporary restraining order and preliminary injunction to prohibit Brozowski from working for Highfield.[2] This court issued a short order of notice for a hearing on Inner-Tite’s preliminary injunction. Brozowski did not appear at that hearing and a preliminary injunction was issued. Subsequently, Brozowksi brought a motion to vacate the preliminary injunction.
Acting pursuant to Mass.R.Civ.P. 65(b)(2), this court ordered that a trial on the merits be advanced and consolidated with a full hearing on Inner-Tite’s motion for preliminary injunction. The case was tried without a jury, reserving those issues where a right to a jury trial has been claimed. After trial, the parties submitted proposed findings of fact and rulings of law, which the court has considered. To the extent they are not found by the court, they are deemed denied.
FINDINGS OF FACT
Based upon the credible evidence introduced at trial and the reasonable inferences drawn therefrom, the court makes the following findings of fact.
I. THE CORPORATION & THE INDUSTRY
Inner-Tite is a Massachusetts manufacturing corporation headquartered in Holden, Massachusetts with over eighty employees. Inner-Tite designs and manufactures meter locking devices, meter seals and mechanical accessories, which are sold exclusively to utility companies both in and outside the United States. The utility companies served by Inner-Tite include public and private utility companies doing business in the electric, gas, water, and telecommunication markets. The products manufactured and sold by Inner-Tite are designed to prevent theft, and are generally known in the industry as revenue-protection products. Based on evidence presented by both parties, this court finds that the revenue protection industry is a highly competitive market with only a few major competitors: Inner-Tite, Highfield, Dewalch Technologies, Inc. (“Dewalch”), McGard, LLC (“McG-ard”), and E.J. Brooks Company (“Brooks”). Having the largest share of the revenue-protection market, Inner-Tite is the industry’s leader.
At its Holden facility, Inner-Tite does all of its own product design, engineering, manufacturing, assembly and distribution.[3] The company manufactures a variety of products, which are regularly re-designed to improve the products in order to meet the on-going needs of its customers. Inner-Tite has invested substantial time and money into the design, development and manufacture of its products and their improvements, including the machines necessary to produce them. The evidence supports a finding that Inner-Tite designs and manufacturers high quality meter locking devices and accessories. And while meter locking devices are simplistic in appearance, and may not be considered high technology products, the court finds that Inner-Tite employs sophisticated design, engineering and manufacturing processes in order to produce relatively low cost meter locking devices that are both cost-effective and simple for the utility companies to use.'[4]
Of significance, is that all of the companies in the revenue-protection industry sell basically the same products, the most common consisting of (a) a metal ring that clamps around round utility meters, such as electric meters; (b) mechanical clamps that attach to utility boxes that house meters; and (c) valve covers for gas and water meters. These devices are then secured by a locking mechanism, called a barrel lock. All of the competitors offer barrel locks, which are either standard or proprietary.[5] Customers often buy similar products from several different competitors at the same time and, therefore, many of the products offered by the various companies can be used interchangeably.[6] Even though a utility company may purchase revenue protection products from a number of manufacturers, there are also times when a company will specify a certain vendor as the sole approved manufacturer (“sole source”) for a particular revenue protection product. On many occasions, Inner-Tite has been designated a sole source provider by various utility companies.
All of the competitors publish publicly available catalogues that contain price lists of their products. All competitors advertise in the trade publications that serve the industry, including the quarterly magazine published by the International Utilities Revenue Protection Association (“IURPA”). All of the major competitors attend the industry conferences, such as the IURPA conference and various “meter schools,” where they exhibit their products at booths located near each other in small hotel ballrooms.[7] All of the companies have websites that display and describe their respective products.
As mentioned above, the customers are both public and private utilities, also known as investor owned utilities (“IOUs”). Given the nature of the utility industry, potential customers are a limited number. Although there are many more public utilities than IOUs, most of the business in the revenue-protection industry is with the IOUs because IOUs control a majority of the utility market.[8] All of the utilities are identified in various public directories published on local, state and national levels.[9] All of the companies in the revenue-protection industry have and utilize the same directories to identify customers.
With regard to public utilities, purchasing decisions are often the result of a public bidding process. Even the IOUs’ purchasing decisions are reasonably trans *206 parent given the highly public regulation of the industry. Because there are only a few major competitors in the revenue-protection industry, most are invited by both the public and private utilities to bid. Even when a utility has a contract with an existing supplier, to obtain the best price, a utility will make it known to its supplier that it is going out to bid and is inviting the other competitors to submit bids. In addition, the utilities often tell the competitors what prices they are paying. Utilities commonly notify all of the bidders of the winning prices, as well as the prices bid by the others. As a result, in the revenue-protection industry price is the most important factor in who wins bids and secures contracts with the utilities; and, therefore, it is common for customers to move back and forth from one company to another.[10]
Although price may be the most significant factor in winning contracts, it is not the only factor. Both parties presented evidence that because prices listed in the catalogues for the various similar products are public information, are not remarkably different from one company to another, and each company has knowledge of their competitors’ prices from the cata-logues, and from what customers tell them (both in the bidding process and otherwise), there are other factors that go into a utility’s decision when deciding which revenue-protection product to use, particularly the IOUs. There was ample evidence that utilities choose revenue-protection products based on the qualify of the product (its specific features, benefits, effectiveness, simplicity to install, and durability).[11] Certain vendors are considered “preferred vendors” due to the quality and track record of their products. Inner-Tite is a preferred vendor for various public utilities. Additionally, there was evidence that the relationship established with a customer plays a factor in deciding what product to use, including the reliability of the revenue-protection company, thus making brand and relationships important factors as well.
II. INNER-TITE’S CONFIDENTIALITY POLICIES & SECURITY MEASURES
Inner-Tite employs a number of measures to protect the confidentiality of the business of the company relating to the development, manufacture and sale of its revenue-protection products, potential products and services. Access by non-employee visitors to the Inner-Tite plant is restricted and closely monitored, including restricting access to the manufacturing area to “authorized personnel only.” There is exterior and interior signage at the plant warning of the restricted access, as well as access codes for exterior doors, which codes are changed approximately every year. To prevent its manufacturing processes from being photographed, Inner-Tite maintains a company policy prohibiting the use of cameras in the building, including the use of cell phones for transmitting or recording pictures.
Visitors are required to sign a Visitors Agreement, which specifically states that Inner-Tite’s “manufacturing processes, methods of manufacture, plant layout and machine design” are trade secrets that are not to be disclosed. It also provides that any information gained from being on the premises belongs to Inner-Tite and may not be disclosed by the visitor. When in the facility, visitors must also be accompanied by an Inner-Tite employee.
With regard to its employees, Inner-Tite grants employees access to information that each employee “needs to know” for his or her specific job. When an employee leaves Inner-Tite, the company takes steps to retrieve equipment, documents, and products belonging to Inner-Tite that were in the possession of the soon-to-be former employee. Every Inner-Tite employee signs a Patent Release Document, which provides in part that “all patentable or patented items on which [the employee] may work, develop or assist in the development of during the course of . . . employment with Inner-Tite Corp. are or are to be the property of Inner-Tite Corp.” All management level employees, with knowledge of confidential information, sign a Secrecy Agreement and Restrictive Covenant. The secrecy clause provides:
The Employee shall not, during or after the term of employment, use or disclose, and will keep in strict secrecy and confidence and treat as the property of [Inner-Tite], any trade secrets, commercial methods, lists of customers, or other confidential information, including, but not limited to, information relating to [Inner-Tite’s] production, marketing, processing, delivery, formulas, procedures, customers, research and sources of supply of [Inner-Tite] which the Employee will have access to by virtue of his employment with [Inner-Tite].
Inner-Tite divides the United States market into six sales territories, each territory being assigned a District Sales Manager (“DSM”) to oversee sales or manufacturers representatives and distributors.[12] The DSM is the main contact person for Inner-Tite for both the utility customer and the sales representatives in his respective region. DSMs are expected to provide customer feedback on products to help Inner-Tite develop new and improved products, and were described as the “eyes and ears” of the company in the field. Many of Inner-Tite’s product improvements had been developed based on DSM input, requiring DSMs to have knowledge and understanding of Inner-Tite’s manufacturing processes and capabilities.-
When first employed, all DSMs must participate in an extensive six-week training program at Inner-Tite’s plant in Holden. Employment is conditioned upon the successful completion of the training program.[13] Each DSM is expected to learn about the design, installation and performance features of Inner-Tite products. The training curriculum includes presentations about the products, their features, and the benefits of each *207 feature, the manufacturing process, as well as sales and marketing. All the information presented during training is deemed confidential by Inner-Tite.
Along with the training, Inner-Tite provides all DSMs with samples of the company’s products as well as brochures and manuals associated with the products. Each DSM is given direct and unlimited access to all of Inner-Tite’s commercial business information within their respective region, including customer names, contact information, purchasing histories, monthly and quarterly sales reports, and sales and marketing plans for their respective region.[14] They are also provided with a laptop computer in order to generate presentations and electronically send confidential call reports to Inner-Tite’s general sales manager. Call reports are detailed summaries of conversations that take place between the DSM and/or sales representatives and the customers. Each call report contains information about the specific customer contact that was spoken to during the call, as well as the minutes of the sales call. The DSM has direct and unlimited access to all of the confidential call reports with customers in their respective regions. This information has limited access at Inner-Tite, and is provided on a restricted and “need-to-know” basis.
Although the various local, state and national public directories of the utility industry contain contact information for each of the utilities, the customer contact information provided by the call reports and other confidential information Inner-Tite gives to its DSMs is considerably more detailed, providing specific names of particular individuals within particular divisions or departments of each utility customer who are the relevant people to talk to regarding revenue-protection products. In addition, customer information generated internally by Inner-Tite’s DSMs and sales representatives contains customer feedback on products so the company can develop new and improved products. Many of Inner-Tite’s product improvements over the years were developed based on DSM input through their customer contacts.
Within each region Inner-Tite relies on its sales representatives to solicit business from the utilities to use Inner-Tite products, making the sales representatives a critical component of Inner-Tite’s sales structure. [15] With all of its sales representatives, Inner-Tite executes a Sales Representation Agreement and Secrecy Agreement and Restrictive Covenant. The secrecy clause is essentially the same as found in the Secrecy Agreement and Restrictive Covenant signed by Inner-Tite’s DSMs and other management employees. In addition, the sales representation agreement requires a sales representative to sell only Inner-Tite products and restricts the representative from selling any products competitive to Inner-Tite not only during the terms of the agreement, but for an additional two years after termination.
All of the evidence presented supports a finding that Inner-Tite has protectable confidential information that it takes great pains to protect regarding the business of the company relating to the development, manufacture and sale of its products, potential products and services. While considerable information about Inner-Tite’s products may be available publicly (from the catalogue, website, and advertising, for example), the designs, engineering and manufacturing processes are not. And, just because Inner-Tite’s competitors may illicitly obtain samples of Inner-Tite’s products from utility customers, does not mean Inner-Tite does not make efforts to protect the confidentiality of its products. Additionally, the fact that customer information, including some contact information for customers, is available publicly does not mean that the more detailed and specific contact information for a particular customer, acquired by Inner-Tite’s DSMs or sales representatives, is not confidential. Because the revenue-protection industry is relatively transparent and highly price driven, Inner-Tite jealously guards the details of the private, confidential information it has in order to gain an advantage in obtaining contracts in this highly competitive environment.
III. BROZOWSKI’S EMPLOYMENT WITH INNER-TITE
Brozowski resides in the state of Georgia. He is thirty-six years old, married with two young children, and the primary source of income for his family. Before coming to Inner-Tite in February 2007, Brozowski had no experience in the revenue-protection industry and only minimal sales experience.[16] Immediately before coming to Inner-Tite, Brozowski had worked in convenience store management as a district manager for The Pantry, Inc., a chain of convenience stores, and Speedway SuperAmerica LLC, a gasoline and convenience store chain before that. He was unemployed at the time he applied for the DSM job with Inner-Tite, having left his position with The Pantry, Inc. in the fall of 2006.
Brozowski applied for a number of jobs, including the DSM position of the southeastern region for Inner-Tite.[17] His initial interview was in Atlanta, Georgia with Lee Holovnia (“Holovnia”), Inner-Tite’s Sales Manager. He was then asked to come to Massachusetts where he had an individual interview with Inner-Tite’s President, George Davis, followed by a group interview, which included, among others, Inner-Tite’s Vice President of Operations, John Mahaney (“Mahaney”), Inner-Tite’s Chief Financial Officer, and Holovnia. Brozowski was given a tour of the plant.[18]
At some point in the interview process, there was a discussion between Holovnia and Brozowsld about compensation. Holovnia told Brozowski the starting base salary was $55,000.00, plus commissions and bonuses. Brozowski testified that Holovnia represented to him that within a couple of years he would be making over $100,000.00 per year. Holovnia, how *208 ever, denies making any such specific statement, but recalls telling Brozowski that the southeast region was under performing and that it had great potential. The court credits Holovnia’s testimony regarding the discussion he and Brozowski had during the interview process regarding potential income.[19] After successful interviews in Massachusetts, Holovnia called Brozowski in Georgia to extend a verbal employment offer. This was followed with a detailed written offer package overnighted by Inner-Tite to Brozowski to his home in Georgia on January 12, 2007.[20]
Inner-Tite’s offer of employment set forth Brozowski’s compensation terms for the DSM position, with a base salary of $55,000.00 to start, but upon successful completion of the six-week training program, it would increase to $57,500.00. The offer also explained the commission schedule. The offer package contained a detailed job description outlining Brozowski’s primary functions as the DSM for the southeastern region, including (a) managing, coordinating and performing sales of Inner-Tite products to domestic customers in his territory; (b) making direct sales and service calls on present and potential customers; (c) selecting, training and making joint calls with sales representatives in his territory; and (d) attending and promoting Inner-Tite products at industry trade shows, seminars and conferences.
The offer letter included the administrative policies for DSMs setting forth Brozowski’s job duty requirements of (a) making forty (40) sales calls per month; (b) submitting call reports on a weekly basis, including names of the customer, contact information and minutes of the meeting; (c) training sales agents on new products and pricing policies; and (d) calling on and getting to know “all segments of an account” such as operations, engineering, customer service, purchasing and standards. Also contained in the offer letter were several caveats in which Holovnia set out his expectations and sales goals for Brozowski. Brozowski took a few days to consider Inner-Tite’s offer, but then accepted it without any further negotiation.
The company’s offer of employment was conditioned upon his successful completion of the six-week training program required of all DSMs. Inner-Tite paid approximately $7,500.00 for Brozowski to travel and attend the training program in Massachusetts, which began on February 12, 2007, which included airfare, hotel expenses, meal allowance, and automobile expenses, as well as for Brozowski to take two long weekends home to visit his family in Georgia. Brozowski successfully completed the training and passed the Product Knowledge Test.[21]
Brozowski was also provided a laptop computer, a printer, samples of the company’s products, as well as brochures and manuals associated with the products. Having had no experience in the revenue-protection industiy, Brozowski did not bring any of his own contacts or business with him when he began working for Inner-Tite. Inner-Tite provided Brozowski with sales histories, specific customer contact information, and sales and marketing plans for the southeast region. The court finds that the information provided to Brozowski was confidential information, which was considerably more information than what was available from any published catalogue, directory, trade magazine, or the company’s website.
As DSM of the southeast region, Brozowski’s main focus was to increase Inner-Tite’s sales by maintaining and servicing Inner-Tite’s current accounts, working with current sales representatives, and recruiting new sales representatives. As the DSM, Brozowski was Inner-Tite’s main contact person for all sales representatives in the southeast region and for the numerous utility customers. Although Brozowski used his home in Georgia as his base, in order to expand and maintain Inner-Tite’s customer base, Brozowski was expected to do, and did, extensive traveling all over the region making sales calls, meeting and entertaining current and prospective customers and sales representatives, as well as attending trade shows and meter schools. Brozowski performed all of these duties and much of his time was spent on the road outside of Georgia. He recruited new sales representatives for Inner-Tite, and worked with those representatives, and existing ones, throughout the southeast region, not just Georgia.
During his three years of employment at Inner-Tite Brozowski was sent to twenty conferences and meter schools, at Inner-Tite’s expense, with the purpose of learning about products in the revenue production business and to foster relationships with utility customers. Brozowski had direct and unlimited access to all of Inner-Tite’s confidential commercial business information in the southeast region, including customer names, specific contact information, purchasing histories, contract terms and conditions, sales and marketing plans, and monthly and quarterly sales reports. Also, Brozowski had direct and unlimited access to confidential call reports.
Despite his position as a DSM, Brozowski had veiy little discretion when it came to pricing. If an order was less than $10,000.00, Brozowski had some discretion, but could not vary greatly from the prices in Inner-Tite’s catalogue. As a DSM, Brozowski did not participate in any sizable bid. Any potential contract over $10,000.00 was priced exclusively by Inner-Tite’s home office and Brozowski was not informed of what prices were offered until after the bid had been submitted.
As discussed above, Inner-Tite required all DSMs to execute a Secrecy Agreement and Restrictive Covenant. The restrictive covenant portion of that agreement provided:
The Employee will not, during his or her employment with the Company, and for a period of two (2) *209 years after the termination or cessation of Employee’s employment with the Company, either directly or indirectly, engage or become interested in any manner, as a shareholder, employee, officer, director, partner, independent contractor, proprietor, owner, in any State of the United States, in any business enterprise which is in any respect com-' petitive with the business of the Company conducted during the term of employment hereunder or at the time of his termination or cessation of employment. The business of the Company is defined as the manufacture, fabrication, distribution and sale of proprietary mechanical products intended for use by the utility industry, specifically by the electric, gas, water and cable TV utility companies. This restrictive covenant does not apply to j ob-shop work or similar work wherein Inner-Tite Corp. performs or provides the services of an independent contractor.
According to the testimony of both Holovnia and Mahaney, which the court credits, due to an oversight by the human resources department, the Secrecy Agreement and Restrictive Covenant had not been presented to three individuals at the time of their hire, Holovnia, Brozowski, and Jeremy Auger, the DSM for the northeast region, who had been hired and trained at the same lime as Brozowski. Holovnia signed the agreement in Holden on May 17,2007.[22] At about that same time, Kristy Madison from Inner-Tite’s human resources spoke with Brozowski and told him he was required to sign the agreement as a condition of employment. On May 22, 2007, while on ajoint sales call with Brozowski in Louisiana, Holovnia presented the Secrecy Agreement and Restrictive Covenant to Brozowski to sign. There was no discussion between Brozowski and Holovnia regarding the agreement. Brozowski read and signed the agreement on May 22, 2007 [23]
During the interview process, no one from Inner - Tite told Brozowski he would be required to sign the Secrecy Agreement and Restrictive Covenant. Holovnia did not tell Brozowski he would be required to sign this agreement when he orally offered him the position, nor did Holovnia tell Brozowski about the agreement in the detailed written offer letter. When Brozowski began his employment with Inner-Tite in February 2007, he signed the Patent Release Agreement, but was not asked to sign the Secrecy Agreement and Restrictive Covenant. There was no evidence presented to support a finding that Inner-Tite had some ulterior purpose for not telling Brozowski of the Secrecy Agreement and Restrictive Covenant before offering him the job and the evidence that was presented does not support such an inference. Also, Brozowski did not testify that if he had known about the restrictive covenant at the time of his hire that he would not have taken the job with Inner-Tite. Rather, Brozowski testified that he would have “seriously weighed the non-compete when considering the offer.”[24]
At the outset of Brozowski’s employment, Inner - Tite set certain sales thresholds for the first three years, which he met by the end of his second year.[25] Overall, Inner-Tite was pleased with Brozowski and Holovnia said he had done a good job while working there. In 2008, Brozowski received recognition for his efforts in promoting and selling two new Inner-Tite products. Brozowski testified that despite having performed well, Inner-Tite provided only minimal financial reward, and he never approached the compensation levels he thought he should receive.[26] Brozowski testified that he never fully understood how Inner-Tite calculated commissions, but he also testified that he did not bother to carefully read the commission schedules the company provided to him. Brozowski further testified that the company’s expense allowances forced him to personally pay a portion of the hotel and food expenses he incurred while performing his job.[27]
During his employment, Brozowski did extensive traveling across the region, made approximately forty sales calls per month, and submitted detailed call reports on a weekly basis. Between February 2007 and October 2009 (when Brozowski left Inner-Tite), he was involved in the preparation of over one thousand call reports, which he emailed to Holovnia who often emailed back his comments. The call reports and responses were prepared and maintained by Brozowski on the laptop provided to him by Inner-Tite. In addition, Brozowski was provided with annual sales reports for the southeast region for 2008 and 2009, which included confidential sales information for customers in the territory. Also, Brozowski participated in the development of at least one new product— Inner-Tite’s “water lock” device.
IV. BROZOWSKI’S RESIGNATION & EMPLOYMENT BY HIGHFIELD
Approximately eight years ago, Highfield was purchased by Rexnord Industries, LLC (“Rexnord”), a Wisconsin corporation, and became a division of Rexnord. Highfield has its principal place of business in Bridgeport, Connecticut. In January 2008, Rexnord hired Joseph McClain (“McClain”) as the new Vice President and General Manager of Highfield. When McClain was hired, Highfield had experienced many years of little or flat growth, and McClain was brought on to turn Highfield around. McClain testified that since coming to Highfield, he has changed the senior staff, changed the manufacturing philosophy, changed the management and sales staff, and completely re-designed the company’s website, advertising and brochures. Under McClain’s direction, Highfield has moved most of its manufacturing overseas to reduce costs, and has pursued an aggressive sales and marketing campaign to increase its market share, which includes aggressively going after its competí- *210 tors, particularly Inner-Tite.[28] Acknowledging that some of its competitors’ products are superior, part of Highfield’s business strategy includes “cloning” those products, particularly Inner-Tite’s. McClain also acknowledged that one of the ways to find out information about the product would be to get the information from someone with specific knowledge of Inner-Tite’s products.[29]
By the spring of 2009, Brozowski had become disillusioned with Inner-Tite. Brozowski learned that Highfield was looking for a DSM for the southeast region and on or about July 1, 2009, while attending a meter school in North Carolina on behalf of Inner-Tite, Brozowski approached the Highfield representative to express his interest in Highfield’s position. In his cover letter to Highfield, Brozowski stated that his “[sjtrong work experience along with an extensive network of utility contacts in the Southeast will enable me to immediately become a highly productive member of your team.”[30] Having been told about Brozowski, Edward Cirella (“Cirella”), Highfield’s national sales manager, brought Brozowski in for an interview on August 3, 2009 at the home office in Connecticut. During the interview, Brozowski told Cirella and the other Highfield executives about the restrictive covenant he had with Inner-Tite. Brozowski specifically asked “would [Highfield] help him with a lawyer if Inner-Tite sues.” The notes from the Highfield interview show that Cirella believed Brozowski’s familiarity with the customer base and knowledge of the products were positives, and McClain believed Brozowski was “worth the risk,” despite the restrictive covenant. McClain testified that, given Highfield’s sales strategy, Brozowski was the most valuable candidate because of his knowledge of the competitors, his knowledge of the revenue protection products, his knowledge of a customer network, and his knowledge of Inner-Tite’s products.
On September 18, 2009, Highfield presented a written offer of employment to Brozowski for the position of Southeastern Regional Sales Manager, which Brozowski accepted on September 25, 2009.[31] Also on September 25, 2009, Brozowski signed and delivered to Highfield a Confidentiality Agreement, which included a restriction against disclosure of any “confidential or proprietary information,” as well as a two (2) year post-employment non-solicitation covenant.[32] The Highfield offer was contingent upon Brozowski’s signing this agreement.[33]
Although he had accepted the offer from Highfield in September, Brozowski waited until October 18, 2009 before giving his two-week notice to Inner-Tite, and he continued to work for Inner-Tite through October 30, 2009. In his resignation letter, Brozowski stated that he was leaving Inner-Tite because he had “been offered another opportunity with more compensation, less travel, and an opportunity for advancement that for my families [sic] best interests I cannot turn down.”[34] When Holovnia called Brozowski to discuss his decision to leave, Brozowski lied to Holovnia and told him that he was taking a position as a franchise consultant with KIA Motors, an automotive company. The court finds that Brozowski purposely lied to Holovnia to postpone Inner-Tite’s becoming aware that he was working as the regional sales manager in the southeast region for Highfield, and to hopefully stop Inner-Tite from enforcing the restrictive covenant.[35]
Following termination, Brozowski sent several boxes of Inner-Tite materials, including most of the product samples, keys, locks, and catalogues, as well as the laptop computer and printer.[36] The court finds that Brozowski returned most of the Inner-Tite materials with the exception of a digital camera and electronic information stored on the laptop and memory stick.[37]
On October 22, 2009, Holovnia notified all the sales representatives in the southeast region that Brozowski would be leaving at the end of the month. After Brozowski’s resignation, all of his e-mails were forwarded to Holovnia. On November 12, 2009, Inner-Tite sent Brozowski his final payment. Confirming that Inner-Tite did not owe him any additional monies, Brozowski acknowledged on November 23, 2009 that he had received “payment in full.”
On November 2, 2009, Brozowski began work at Highfield as the Southeast Regional Sales Manager and immediately began using the information, knowledge, and experience he had acquired from Inner-Tite, including specific and confidential product information, customer contact information, and sales representative information. Brozowski spoke at a Highfield sales meeting on competitor’s products, accounts, and sales representatives in the southeast. In addition, Brozowski discussed Inner-Tite products and their drawbacks with Highfield sales representatives; provided Highfield with Inner-Tite’s customers’ purchasing histories; and scheduled and made sales calls with Inner-Tite customers.[38]
More specifically, on November 23, 2009, Holovnia received a forwarded email from Brozowski’s Inner-Tite email account from a representative from an Inner-Tite customer (Energen Corporation) referencing a scheduled lunch with Brozowski for December 1, 2009. Holovnia responded on November 30, 2009 advising the customer that Brozowski had left Inner-Tite to work for KIA Motors. In a Highfield 'trip report dated December 1,2009, Brozowski describes meeting with the same representative of Energen who had sent the November 23rd email to Brozowski at Inner-Tite. The purpose of the meeting, as stated in the trip report, was to: “Gain acceptance with the Purchasing Department to allow [Highfield] to receive bidding opportunities in the future . . . Inner-Tite products were single sourced in the past and once we are put on standards *211 things will be bid out and we will pursue a blanket in the future if it is in our best interest.”[39]
In early January 2010, an Inner-Tite sales representative in the southeast region notified Holovnia that Brozowski was present at a planning meeting for a meter school as a regional sales manager for High-field. Upon receiving this information, Holovnia immediately notified Inner-Tite’s president and vice-president (Mahaney) and requested an immediate audit and report from the technology department on the laptop returned by Brozowski. It was at this point that Inner-Tite learned that Brozowski had deleted all the files and folders he had created during his employment.
Also in early January, Inner-Tite received a letter from Ruffin and Associates (“Ruffin”), one of its sales representatives in the southeast region that had worked with Brozowski, informing the company that it was terminating its agreement with Inner-Tite in order to work with Highfield. When reminded of the restrictive covenant included in the Sales Representation and Secrecy Agreement, Ruffin agreed not to become a sales representative for Highfield. Ruffin, however, was not the only Inner-Tite sales representative in the southeast contacted by Highfield after Brozowski joined the company. Documentary evidence from Highfield shows that in December 2009 and January 2010, Brozowski arranged for Cirella to solicit two exclusive sales representatives of Inner-Tite’s in the southeast region, namely Utility Specialists, Inc. and Lekson Associates, Inc.[40]
After learning that Brozowski was working for High-field, and believing that he was likely to use and disclose Inner-Tite’s confidential commercial and proprietary information, as well as exploit Inner-Tite’s goodwill with its sales representatives and customers, Inner-Tite commenced this action to enforce the Secrecy Agreement and Restrictive Covenant. Brozowski testified that he has not used any Inner-Tite information since the end of his employment and did not use it in his employment with Highfield. The court does not credit this testimony.
In an effort to suggest that Inner-Tite has not taken appropriate steps to protect what it considers confidential information, trade secrets and goodwill, Brozowski attempted to present evidence that Inner - Tite did not enforce the Secrecy Agreement and Restrictive Covenant against his predecessor, Michael Stevens (“Stevens”), even after learning that Stevens had gone to work for Dewalch. Based on the credible evidence, the court finds that Stevens had been the DSM in the southeast region prior to Brozowski and had signed the Secrecy Agreement and Restrictive Covenant with the two-year non-compete restriction. The court further finds that Stevens left Inner-Tite in October 2006 and was seen by Brozowski at a conference working for Dewalch in May 2009, which was beyond the two-year restriction contained in the restrictive covenant, and not supportive of Brozowski’s position.[41]
Since the imposition of this court’s preliminaiy injunction, Brozowski has done no work for Highfield, and claims he has not contacted, solicited, diverted or attempted to divert any customers or sales representatives of Inner-Tite since that date.[42] Brozowski has indicated that he has no intention to and will not provide any information regarding Inner-Tite to High-field.
RULINGS OF LAW I. SECRECY AGREEMENT AND RESTRICTIVE COVENANT A. CHOICE OF LAW
The Secrecy Agreement and Restrictive Covenant (“Agreement”) entered into between Inner-Tite and Brozowski contains a choice-of-law provision calling for the application of Massachusetts law. Brozowski argues that Georgia law should govern the Agreement and that, as a result, it is void and unenforceable. Brozowski cites to a Georgia case, which holds covenants against competition represent a partial restraint of trade and, therefore, must be strictly construed, and limited in time, place, and duration. McNease v. National Motor Club, 238 Ga. 53, 55 (1976). Brozowski further points out that a Georgia court will not “blue-pencil” a restrictive covenant. Id. at 57 (“If a contract contains illegal and unenforceable clauses within a restrictive covenant, the entire covenant must fail because this court has refused to apply the blue-pencil theory of severability”). For the reasons set forth below, this court holds that Massachusetts law shall govern the construction and application of the Agreement between Inner-Tite and Brozowski.
In deciding choice-of-law issues, the court applies a “functional” approach in concert with the principles of the Restatement (Second) of Conflict of Laws (“Restatement of Conflicts”). Hodas v. Morin, 442 Mass. 544, 549-50 (2004). This functional choice-of-law approach “responds to the interests of the parties, the [s]tates involved, and the interstate system as a whole.” Bushkin Assocs., Inc. v. Raytheon Co., 393 Mass. 622, 631 (1985). As a general rule, Massachusetts courts will uphold the parties’ choice of law as long as the result does not violate public policy. Hodas, 442 Mass. at 549-50. Under the provisions of the Restatement of Conflicts, the law of the state chosen by the parties will govern unless there is no reasonable basis for the choice, or the law of the chosen state would offend a fundamental public policy of a state with a materially greater interest in the transaction and whose law would have governed absent any choice-of-law provision. Restatement (Second) of Conflict of Laws, §187.
Thus, the analysis is as follows: (1) is a fundamental public policy of Georgia offended by the application of Massachusetts law, and if so (2) does Georgia have a materially greater interest in the transaction, and if so *212 (3) under the default provisions of Section 188, would the law of Georgia have governed absent a choice-of-law provision.
1. Fundamental Public Policy
A Georgia court will enforce a non-compete agreement that is narrowly circumscribed and otherwise reasonable in all respects, but it will not reform an agreement to meet these requirements. See McNease, 238 Ga. at 55-57 (acknowledging validity of covenants against competition in employment contracts but refusing to enforce unreasonable non-compete and ignoring severability clause). Under Massachusetts law, however, a non-compete agreement may be reformed where it is too broad on its face as to time or territoxy. See All Stainless, Inc. v. Colby, 364 Mass. 773, 778 (1974); Cedric G. Chase Photographic Labs. v. Hennessey, 327 Mass. 137, 139 (1951) (“If the restriction is too broad as to time ... or territory ... it may be enforced to the extent necessary to protect the plaintiff.” [internal citations omitted]). Nonetheless, this conflict does not prohibit the application of Massachusetts law to the present case. “[T]he proper inquiry under Massachusetts choice-of-law rules is whether [Georgia] has a fundamental public policy that would be frustrated by the application of Massachusetts’ substantive law, and not whether a [Georgia] court would void the covenant pursuant to a statute.” (Emphasis added.) Shipley Co., Inc. v. Clark, 728 F.Sup. 818, 826 (1990).
This court concludes that Georgia’s fundamental public policy is against unreasonable or overbroad non-compete agreements. Since the application of Massachusetts law will result in the enforcement of a non-compete that is reasonable in all respects, founded upon valuable consideration, necessary to protect the party in whose favor it is imposed and which does not unduly prejudice the interests of the public, it is not contrary to a fundamental public policy of Georgia. See Hostetler v. Answerthink, Inc., 267 Ga.App. 325, 328 (2004).
2. Materially Greater Interest
Even if a Georgia court were to disagree with this court’s conclusion as to the fundamental policy of the State of Georgia, in order to avoid the Massachusetts choice of law, Brozowski must also prove that Georgia has a “materially greater interest” in the transaction than Massachusetts. Hodas, 442 Mass. at 549-50. Restatement (Second) of Conflict of Laws, §187. The “most significant relationship” test expands upon the factors used in the Restatement of Conflicts §188 to determine which state’s law would govern in the absence of an effective agreement. Oxford Global Resources, Inc. v. Guerriero, 2003 US Dist. Lexis 23503 (2003). The factors enumerated in Guerriero to determine which state has the “most significant relationship” are informative in deciding which state has a “materially greater interest.” In assessing the twelve factors of the most significant relationship test, the court finds that neither state has an interest materially greater than the other. However, considerations of judicial economy and interstate administration of justice point to the application of Massachusetts law.
The first five factors overlap and are repeated in Section 188 of the Restatement of Conflicts. As discussed below, these factors are inconclusive. The remaining factors suggest application of Massachusetts law, but not to such a great degree as to preclude discussion. Both Massachusetts and Georgia have valid policy reasons for their repective positions. It is the certainty, predictability and uniformity of result, as well as the ease of determination of the applicable law, which tips the scale in favor in Massachusetts. Since Brozowski performed his contract in ten states, it would be impossible to reconcile each of the states’ polidies on restrictive covenants. See Kershaw v. Knox Kershaw, Inc., 523 So.2d 351, 359 (Ala.Sup.Ct. 1988) (“overbreadth and vagueness does not invalidate the entire covenant [not to compete]”); Central Adjustment Bureau, Inc. v. Ingram, 678 S.W.2d 28, 37 (Tenn.Sup.Ct. 1984) (‘The most recent trend, therefore, has been to abandon the ‘blue pencil’ rule in favor of a rule of reasonableness . . . the rule of reasonableness is the better rule”); Lafourche Speech & Language, Inc. v. Juckett, 652 So.2d 679, 680 (La.Ct.App. 1995) (“In order to be valid, a non-compete agreement must strictly comply with the requirements of [La.R.S. 23:921]”); Stohhard, Inc. v. Carolina Flooring, 366 S.C. 156, 160 (2005) (“we hold that the covenant [not to compete], despite any reformation, is void and unenforceable as a matter of public policy”); Hartman v. WH Odell and Assocs., Inc., 117 N.C.App. 307, 317 (1994) (“North Carolina’s ‘blue pencil’ rule severely limits what the court may do to alter the covenant. A court at most may choose not to enforce a distinctly separable part of a covenant in order to render the provision reasonable. It may not otherwise revise or rewrite the covenant”); Health Care Fin. Enters. v. Levy, 715 So.2d 341, 342 (Fla.Ct.App. 1998) (“courts [are] required to modify unreasonable restrictions as to time and place rather than refuse to enforce the [non-compete] agreement”).
As the law chosen by the parties, Massachusetts law has a more significant and consistent relationship to the transaction — a transaction spread across ten states. Consequently, Massachusetts has the greater interest (if not a materially greater interest) and its law must therefore govern the Agreement.
3.Section 188 Default Rules ,
Section 188 of the Restatement of Conflicts provides a list of factors used “to determine what law would have applied if the contract itself were silent on the issue.” Hodas, 442 Mass, at 551-52. These factors are: “(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorpo *213 ration and place of business of the parties.” Restatement (Second) of Conflict of Laws, §188. The enumerated factors, however, may not be dispositive of the issue on which state’s law would apply absent an effective choice of law provision. Id. at 552 (“Again, consideration of the factors listed in §188 leads to inconclusive results”).
Here, the Restatement factors used to determine which state’s law would apply, absent an effective choice-of-law provision, are equally inconclusive: (a) Louisiana was the place of contracting; (b) there was no negotiation of the contract; (c) the place of performance was the ten states comprising the southeast of the United States; (d) the location of the subject matter of the contract was Massachusetts, and the ten southeastern states comprising Brozowski’s territory, and finally; (e) the domicile of Brozowski and the place of incorporation of Inner-Tite are split between Georgia and Massachusetts. “ ‘Where the significant contacts are so widely dispersed that determination of the state of the applicable law without regard to the parties’ choice would present real difficulties,’ the Restatement instructs that the parties’ choice of law will be honored.” Hodas, 442 Mass. at 552-53, citing Restatement (Second) of Conflict of Laws, §187, Comment g.
As discussed above, the parties’ choice of law will be honored unless the conditions of the Restatement of Conflicts sections 187 and 188 are met. There was a reasonable basis for the chosen state, since Massachusetts is the place of incorporation and principal place of business of Inner-Tite. Section 187(a), therefore, is unavailing. Taking Section 187(b) into consideration, the court holds that application of Massachusetts law does not offend a fundamental policy of the State of Georgia. Furthermore, the “most significant relationship” test is inconclusive in determining which state has a “materially greater interest . . . in the determination of the particular issue.” Similarly, in the absence of an effective choice of law provision, the factors of Section 188 do not provide for a clear application of one state’s law over the other. For all of the foregoing reasons, the parties’ choice of law should be honored. See Hodas, 442 Mass, at 552-53. Restatement (Second) of Conflict of Laws, §§187, 188.[43]
C. Application of Massachusetts Law to the Agreement
A non-competition agreement is enforceable in Massachusetts if it is reasonable in view of all the circumstances. All Stainless, 364 Mass, at 778. An agreement is enforceable if it is: (1) supported by consideration; (2) necessary to protect legitimate business interests; (3) consonant with the public interest; and, (4) reasonably limited in scope, duration and geographic limitation. Marine Contractors Co. v. Hurley, 365 Mass. 280, 287 (1974); Bowne of Boston, Inc. v. Levine, 7 Mass. L. Rptr. 685, 686 (Mass.Super. 1997).
As written, this court finds that this Agreement is unenforceable because it is unreasonable in scope, duration and geographic limitation. See Wells v. Wells, 9 Mass.App.Ct. 321 (1980); All Stainless, 364 Mass. 773. On the other hand, the Agreement is supported by consideration, is necessary to protect the legitimate business interests of Inner-Tite, and serves an important public policy consideration. Therefore, this court will enforce the Agreement to the extent that it is reasonable and does not offend the requirements for enforceability in either Massachusetts or Georgia. See All Stainless, 364 Mass, at 777 (“We hold that... the restrictive covenant should have been enforced to the extent it was reasonable . . .”).
1. Consideration
Continued employment is sufficient consideration to support a non-compete agreement in Massachusetts. See Horner v. Boston Edison Co., 45 Mass.App.Ct. 139, 143 (1998) (stating that continued employment constitutes sufficient consideration for a release of claims); Smith v. Graham Refrigeration Products Co, Inc., 333 Mass. 181, 186 (1955) (“The continued employment of the plaintiff by the defendant under the new arrangement, which was not obligatoiy on the part of the defendant, was sufficient consideration to render the agreement enforceable”); EMC Corp. v. Donatelli, No. 091727BLS2 (Ma.Super. May 5, 2009) [25 Mass. L. Rptr. 399], quoting Wilkinson v. OCC, Inc., 53 Mass.App.Ct. 1109 (2001) (unpublished decision) (“To the extent new consideration was required [to support a non-competition agreement ‘imposed on’ plaintiff when he was already employed], continued employment was the consideration” (brackets in original)). Therefore, the non-compete at issue in this case was supported by sufficient consideration.
2. Legitimate Business Interest
Inner-Tite has a legitimate business interest in protecting its confidential information from competitors. Wells, 9 Mass.App.Ct. at 323 (“[t]he interests which an employer may protect are trade secrets, confidential data, and good will”). Brozowski was privy to Inner-Tite data that qualifies as protectable confidential information and must, therefore, be bound by the Secrecy Agreement. Should Brozowski call on an Inner-Tite customer, with whom he had previously dealt, to solicit purchases on behalf of Highfield, the good-will of Inner-Tite will be harmed. See All Stainless, 364 Mass, at 777. “The crucial issue to be determined in cases involving trade secrets ... is whether the information sought to be protected is, in fact and in law, confidential.” Jet Spray Cooler, Inc. v. Gifford, 361 Mass. 835, 840 (1972).
Each case must be determined individually in light of the conduct of the parties and the subject matter of the information. Id. Six factors of inquiry have been established as relevant: “(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others *214 involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.” Id., citing Restatement ofTorts, Section 757, Comment b.
As discussed above, Inner-Tite employs a number of measures to protect the confidentiality of its business relating to the development, manufacture and sale ofits revenue-protection products, potential products and services. Information pertaining to the inner workings of Inner-Tite, and the revenue protection industry in general, is not readily available outside of the business and the industry. Inner-Tite specific information is generally disseminated to its employees on a “need-to-know” basis only. This jealously guarded wealth of information would be extremely valuable in the hands of a competitor, or even to a criminal intent on stealing utility service. Inner-Tite has spent a tremendous amount of money and effort in developing both their manufacturing processes and products.[44] Finally, the ease or difficulty in properly acquiring or duplicating the information varies widely depending on the particular product and company involved. One important fact the court notes is that although Brozowski disclaimed receiving any benefit from his six-week training program at Inner-Tite, it is the very knowledge he gained there that Highfield found valuable and now seeks to employ. The court finds that Brozowski could not perform his DSM job for Highfield without a good working knowledge of industry-wide products, including their design features, how they performed, how they were made, and how to market them. The Inner-Tite training curriculum and Product Knowledge Test demonstrates that there was significant information given and learned about each of the products manufactured and sold by Inner-Tite, and which Brozowski now seeks to use to take market share away from Inner-Tite and deliver to Highfield.
In applying the six factors listed above, and evaluating the conduct of Inner-Tite and Brozowski, the court holds that Inner-Tite has a legally protectable and legitimate business interest in protecting their confidential sales data, specific customer information, proprietary manufacturing processes, and technically detailed non-public product data.
3. Public Interest
Brozowski argues that the public’s interest, particularly in this economic crisis, is to keep as many citizens employed and earning wages as possible. While that may be true, it is also in the public interest to preserve businesses in which to work. Requiring reasonable enforcement of non-compete and secrecy agreements preserves legitimate business interests and maintains the expectations of the parties, which helps to sustain a business. This results in economic stability, which is clearly in the public interest. “It is in society’s best interest to recognize and enforce agreements which were voluntarily entered into and accepted. Allowing an individual to disregard such a promise would result in behavior which should not be condoned or encouraged.” Shipley Co., LLC, 926 F.Sup. at 30 (enforcing non-compete and granting injunction).
4. Scope, Duration, Geographic Limitation
To be enforceable, a covenant restricting competitive activity must be reasonable on its face in terms of time, geographic scope and subject matter. All Stainless, 364 Mass, at 778. In determining whether a restriction is reasonable, a court is to consider the nature of the plaintiffs business and the character of the employment, the situation of the parties, the necessity of the restriction for the employer’s protection and the employees’ right to work and earn a living. Richmond Bros., Inc. v. Westinghouse Broad. Co., Inc., 357 Mass. 106, 110 (1970). Novelty Bias Binding Co. v. Chevrin, 342 Mass. 714, 716 (1961).
In this case, the Agreement states Brozowski “will not... for a period of two (2) years after the termination or cessation of [his] employment with [Inner-Tite], either directly or indirectly, engage or become interested in any manner ... in any State of the United States, in any business enterprise which is in any respect competitive with the business of [Inner-Tite].” The Agreement then defines the business of the company as “the manufacture, fabrication, distribution and sale of proprietary mechanical products intended for use by the utility industry, specifically by the electric, gas, water and cable TV utility companies.” These restrictions are too vast in scope, time, and breadth of coverage to be reasonable. Nor are they necessary to protect Inner-Tite’s legitimate business interests.
The court finds that the Agreement is an unreasonable restraint on competition and should be enforced only to the extent necessary. See Cedric G. Chase Photographic Labs., 327 Mass, at 139. The broad restrictions on Brozowski’s scope of employment shall be reformed to include only manufacture, fabrication, distribution, marketing, and sale of revenue protection devices. In addition, the time period of restriction is reduced from two years to one year from the date of issuance of the preliminary injunction. Finally, the vast geographic scope shall be condensed to the southeastern states in which Brozowski actually worked for Inner-Tite.[45] Therefore, in accordance with the terms of this order, as set forth below, the Agreement will be enforced only to the extent that it is reasonable and necessary to protect the plaintiff.
D. Brozowski’s Affirmative Defenses
Brozowski argues that Inner-Tite should be es-topped from enforcing the Agreement because Inner - Tite has “unclean hands,” has failed to perform its part *215 of the bargain, and has made certain representations on which he relied to his detriment. These interrelated arguments are without merit and, consequently, must fail.
Brozowski’s main argument for estoppel is premised on the theory that Inner-Tite purposefully failed to inform Brozowski that he would have to sign a non-compete and secrecy agreement. Brozowski claims he reasonably relied on this omission to his detriment because in accepting Inner-Tite’s offer he rejected three other employment offers. As discussed above, the only evidence presented on the three alleged offers was the testimony of Brozowski, whom this court does not credit. In addition, Holovnia credibly testified that the failure to present Brozowski with the Agreement at the time of his hiring was an oversight by Inner-Tite not an intentional omission.
The basis for Brozowski’s unclean hands and failure to perform arguments rest on his theory that Inner-Tite failed to live up to the representations made to him at the time the initial employment contract was formed. As stated above, the court does not find Brozowski’s testimony credible and, therefore, rejects the notion that Holovnia or Inner-Tite promised Brozowski any other salary than that which he was given. Moreover, even if Holovnia did mention the potential to earn $100,000.00 per year, as Brozowski claims, this was merely a statement of what would be possible in the future, with commissions, and not a guarantee of compensation.
Brozowski further argues that his reimbursements for travel expenses obstructed his ability to increase sales and required personal payment of Inner-Tite business expenses. There was no credible evidence presented on this point other than Brozowski’s testimony that his wife made calculations, which he reviewed, that totaled approximately $6,000.00. Moreover, whether or not Brozowski had to pay out of pocket for refreshments, or stay in his hotel of choice, is not material to this dispute.
Finally, the notion that Inner-Tite ought to be estopped from enforcing its agreement with Brozowski because they did not enforce their agreement with Stevens, Brozowski’s predecessor, is rejected. Inner-Tite is free to waive their contract rights as is any other party. In any event, the evidence presented shows that the two-year time period for enforcement had elapsed when Inner-Tite first became aware of Stevens’ employment with Dewalch.
II. BREACH OF FIDUCIARY DUTY
“Employees occupying a position of trust and confidence owe a duty of loyalty to their employer and must protect the interests of the employer.” Chelsea Indus., Inc. v. Gaffney, 389 Mass. 1, 11 (1983). Such an employee “is bound to act solely for his employer’s benefit in all matters within the scope of his employment, [and] an executive employee is barred from actively competing with his employer during the tenure of his employment, even in the absence of an express covenant so providing" (internal quotations omitted). Id. at 11-12. “An at-will employee may properly plan to go into competition with his employer and may take active steps to do so while still employed.” Augat, Inc. v. Aegis, Inc., 409 Mass. 165, 172 (1991). “There are, however, certain limitations on the conduct of an employee who plans to compete with his employer. He may not appropriate his employer’s trade secrets . . . [h]e may not solicit his employer’s customers while still working for his employer... and he may not carry away certain information, such as lists of customers” (citations omitted). Id. at 172-73. It naturally follows that Brozowski could not act on behalf of Highfield, for his own personal gain, while still employed by Inner-Tite. See id; Chelsea Indus., Inc., 389 Mass. at 11.
Brozowski was one of only six regional sales managers employed by Inner-Tite to cover the United States. New employees ranked higher than Brozowski in the corporate structure. He worked independently, was entrusted with sensitive and confidential information, and as the public face of Inner-Tite in the southeast region, he occupied a position of trust and confidence. While Brozowski was certainly free to leave Inner-Tite, he was not free to plunder data and intellectual resources. See Augat, Inc., 409 Mass. at 172-73. Brozowski’s testimony that he was diligently working on behalf of Inner-Tite and not siphoning off information for Highfield is not credible given the detailed trip reports that resulted from Brozowski’s brief employment with Highfield. For the one-month period during which Brozowski had secretly accepted employment with Highfield, but remained employed by Inner-Tite, he was in breach of his fiduciary duty of loyalty to his employer.
Contrary to Brozowski’s testimony, it is doubtful that such a duplicitous and clandestine relationship could have been carried out ethically. It is more likely than not that Brozowski concealed his departure, and then lied about it, in order to gain an improper competitive advantage for himself and Highfield, as well as to retain the opportunity to copy electronic information from his Inner-Tite laptop and memory stick. Therefore, Brozowski has breached his duty of loyalty to his employer, Inner-Tite, by engaging in a course of conduct designed to hurt Inner-Tite and by electronically capturing certain confidential information. Augat, Inc. 409 Mass, at 172-73. Damages shall be determined at a future hearing by proof of losses Inner-Tite may have sustained as a result of Brozowski’s breach of his duty of loyalty.
III. PERMANENT INJUNCTION
The standard for issuing a permanent injunction requires a finding that: “(1) the plaintiffs [will] prevail on the merits; (2) plaintiffs would suffer irreparable injury in the absence of injunctive relief; (3) the harm *216 to plaintiffs would outweigh the harm the defendant would suffer from the imposition of an injunction: and (4) the public interest would not be adversely affected by an injunction.” AW Chesterton Co., Inc. v. Chesterton, 128 F.3d 1, 5 (1st Cir. 1997), citing Indian Motocycle Assoc. v. Mass. Hous. Fin,, 66 F.3d 1246 (1st Cir. 1995). See also EBay, Inc. v. Mercexchange, LLC, 547 U.S. 388, 391 (2006). As discussed herein, the merits of Inner-Tite’s claim are strong, but their remedy at law would be inadequate. Where a party has no adequate remedy at law, they are entitled to equitable relief. See Foster v. Evans, 384 Mass. 687, 694 (1981); Mark v. Kahn, 333 Mass. 517, 520 (1956). The remaining factors necessary to a determination that a permanent injunction should issue are discussed below.
A. Irreparable Injury
Inner-Tite has already suffered, to some extent, an irreparable injury by virtue of Brozowski’s sales efforts conducted prior to this court’s issuance of a temporary restraining order. The testimony of McClain, along with the documentary evidence from Highfield, together with the detailed trip reports, show a Highfield strategy of unapologetically going after and taking market share away from Inner-Tite. McClain’s testimony confirmed this strategy, and its calculus into Highfield’s decision to hire Brozowski. Brozowski has undoubtedly spent some of the good-will he gained while working for Inner-Tite as evidenced by his meetings with customers at utility companies who had never heard of Highfield until Brozowski (known to them because of Inner-Tite) made a presentation. The aggregate amount of customer data, sales history, and product knowledge retained in Brozowski’s mind, merely from having been employed with Inner-Tite for three years, is not capable of being protected. The risk of injury to Inner-Tite in lost business, present and future, especially where they are a sole source provider is without a doubt substantial. This injury, if any, would be irreparable if Brozowski was not enjoined from working for Highfield to take-over sole source contracts from Inner-Tite customers, especially those who had never heard of Highfield until Brozowski met with them.
B. Balancing of Respective Harm
In this matter the court must balance the potential harm presented to Brozowski by enforcing the Agreement, with the potential harm presented to Inner-Tite by its non-enforcement. To the extent enforced by this court’s order, the Agreement does not harm Brozowski any more than its non-enforcement would harm Inner-Tite. With no adequate remedy at law, greater harm would befall Inner-Tite if the Agreement were not enforced than will result to Brozowski from the injunction.
Although Brozowski will not be able to work for Highfield in the capacity for which he was hired, in the territory for which he was hired, he may still do the same job in a different territory. Alternatively, Brozowski could work in the utility industry in the southeast in a capacity that does not involve revenue protection devices, or return to the industry he knew before working for Inner-Tite. Conversely, if the agreement is not enforced, Inner-Tite stands to lose potentially millions of dollars in business. The harm caused by the inevitable, if inadvertent, disclosure of sensitive company data may be immeasurable. Essentially, Inner-Tite has no adequate remedy at law because of the extreme difficulty in putting a monetary value on the total amount of lost business and diminution in good-will that would result from Brozowski’s dissemination of Inner-Tite’s trade secrets and his failure to otherwise comply with the Agreement. When the court compares the relative harm to both parties, the equities militate strongly in favor of a permanent injunction enforcing the Agreement to the extent permitted by this order.
C. Public Interest
As discussed above, there are two competing public interests the court has considered in this controversy. One is the interest in keeping citizens employed during this economic downturn. The second is preserving legitimate business interests and maintaining the expectations of the parties. There is also a strong interest in protecting businesses from competitors seeking to lure away employees in order to learn trade secrets and gain a competitive advantage.
The court has duly considered the public interests implicated in the enforcement of this Agreement and concludes that enforcement is in the public interest because it protects the legitimate business interest of Inner-Tite and preserves the expectations of the contracting parties. Therefore, having satisfied all factors necessary for the issuance of a permanent injunction, the preliminary injunction issued January 27, 2010 shall remain in effect in accordance with this order.
ORDER
For the foregoing reasons, it is hereby ORDERED that:
1. On Count I, Breach of Contract, defendant Brozowski is in breach of the Secrecy Agreement and Restrictive Covenant. Damages to be determined at a later hearing.
2. On Count II, Breach of Fiduciary Duty, defendant Brozowski has breached his fiduciary duty to the plaintiff Inner-Tite. Damages to be determined at a later hearing.
3. On Count III, for a period of one (1) year commencing January 27, 2010, Brozowski is permanently RESTRAINED AND ENJOINED from:
a. Engaging or becoming interested in any manner, as an employee, officer, director, partner, independent contractor, proprietor, or owner, in any of the states in the southeast region of Inner-Tite,* in any business enterprise which is engaged in the manufacture, fabrication, distribution, marketing, and sale of revenue protection devices for the electric, gas, water and cable TV utility companies;
*217 b. Contacting, soliciting, diverting and/or attempting to divert Inner-Tite’s customers and/or sales representatives from Inner-Tite in any of the states in the southeast region of Inner-Tite*; and
c. Taking, using, divulging, or disposing of Inner - Tite’s confidential and/or proprietary information, including, but not limited to commercial methods, lists of customers, information relating to the Inner-Tite’s production, marketing, processing, delivery, formulas, procedures, specific personal contacts within each general customer contact, and research and sources of supply for Inner-Tite’s revenue protection devices.
* The “southeast region of Inner-Tite” includes the following stales: Florida, Georgia, Alabama, Mississippi, Louisiana, Arkansas, Tennessee, North Carolina, South Carolina, and Texas.

 Highfield is a division of Rexnord Industries, LLC.

 Inner-Tite has not asserted any claim against Highfield, which is not a party to this action.

 The Holden faciliiy, which contains its plant and administrative offices, is the only faciliiy Inner-Tite maintains.

 Many of Inner-Tlte’s products have held patents. At present, Inner-Tite holds fifty (50) patents and ten (10) pending patents on its products.

 The standard barrel lock and key is interchangeable, regardless of which company manufactured it, while the proprietary lock has a dedicated lock and key specific to the particular utility customer.

 For example, it is not uncommon that an electric utility would buy locking rings from Inner-Tite, Highfield and/or any of the other companies; or for a customer to use a Highfield barrel lock (either proprietary or standard) to secure a High-field locking ring, an Inner-Tite locking ring or an Inner-Tite Jiffy Lock (a clamp that attaches to a utility box).

 “Meter schools” are events for utility customers put on by meter manufacturers to provide instruction to the utilities’ personnel on the manufacturers’ meters. Tire companies selling revenue-protection products pay to have a booth at those meter schools to promote their products to the utility customers who send representatives to the meter schools.

 For example, according to the American Public Power Association’s 2008-2009 Annual Directory & Statistical Report, IOUs provide electrical service to almost 70% of the electric consumers, accounting for almost 64% of the total sales revenue.

 An example of such a directory is the American Public Power Association’s 2008-2009 Annual Directory & Statistical Report (Exhibit 48).

 When a utility moves from one company to another on a particular product, the change is known as a “swap-out.” For example, a utility may have a contract with Inner-Tite for meter box locks and, therefore, purchased its Jiffy Lock, but after a new bidding process on that contract, Highfield may come up with the winning bid, so the utility swaps out the Jiffy Lock and begins using Highfield’s Side & Bottom Mount Lock.

 For example, both Inner-Tite and Highfield in their advertising do not mention price but do point out the distinguishing features that make their particular product a better purchase for the customer. The same is true for their websites.

 Collectively referred to as “sales representatives.”

 At the end of the training, each DSM is required to pass the Company’s Product Knowledge Test with an 80% or better.

 The sales plans are prepared yearly for each individual DSM, and are both a review of the past year’s performance and a work plan for the upcoming year.

 There was evidence that sales representatives are a critical component of the entire revenue-protection industry’s sales structure.

 Brozowski holds a bachelor’s degree in marketing and sales, with a master’s degree in business administration.

 Inner-Tite’s southeast region encompasses Florida, Georgia, Alabama, Mississippi, Louisiana, Arkansas, Tennessee, North Carolina and South Carolina, as well as a part of eastern Texas.

 Brozowski was not asked to sign the Inner-Tite Visitor Agreement at the time of his plant tour.

 Brozowski may have wanted to earn $ 100,000.00 ayear, but the court does not credit Brozowski’s testimony that Holovnia told him he would. The court found much of Brozowski’s testimony to be based on self-serving rationalizations that Brozowski believed to be true because such beliefs justified decisions that he made and actions that he took, after the fact. On important issues, however, there was either no competent evidence to support his position or documentary evidence that was not supportive.

 There is also no evidence that when Holovnia verbally offered the DSM position to Brozowski that he represented to Brozowski that he would be making $100,000.00 in a couple of years, and there is no such representation contained in the written offer. In fact, assuming Brozowski carefully read the full compensation package with the commission schedule as provided in the offer, he knew that his compensation was likely not to be as he claims.

 In rather cavalier and bravado testimony, Brozowski testified that the training was unproductive and “had nothing to do with helping me sell products.” The court does not credit this testimony. A review of the training curriculum and Product Knowledge Test demonstrates that there was significant information given and learned about each of the products manufactured and sold by Inner-Tite. Given that Brozowski had no knowledge about revenue protection devices prior to coming to Inner-Tite, the court finds that Brozowski could not have performed the DSM job without a good working knowledge of the products, including their design features, how they performed, how they were made, and how to market them. While he may not have retained the more refined details on the manufacturing processes, the court finds that Brozowski’s present knowledge of these types of products and understanding the distinctions between the products offered by competitors is based on be training and experience he received while employed at Inner-Tite.

 Holovnia testified that he realized in May 2007 that he had not signed a restrictive covenant and was concerned that if he had not signed one, perhaps others had not as well. He then learned that the only others were Brozowski and Auger.

 Brozowski did not question Holovnia about the agreement, nor did he seek legal advice regarding the agreement prior to signing it.

 Based on this court’s overall impression of Brozowski’s testimony and his later fabrications to Inner-Tite (see infra), the court is not convinced that he received other job offers. Again, Brozowski testified that he did not believe the other companies had restrictive covenants or non-competition agreements, but there was no evidence submitted to confirm Brozowski’s belief. Assuming there were other offers, the court is still not convinced that the restrictive covenant would have been a serious factor in Brozowski’s decision to accept the job with Inner-Tite.

 Holovnia testified that Brozowski’s performance was better for the first two years than the third year.

 The commissions and bonuses paid to Brozowski increased his compensation level to $52,658.93 for the ten and one-half months he worked in 2007 ($59,005.08 annualized), $65,716.98 in 2008, and $60,757.52 for the ten months he worked in 2009 ($72,909.02 annualized).

 The court credits Brozowski’s testimony that at times he was unable to stay within the budgeted amount Inner-Tite allowed for lodging and meals; however, there was no competent evidence as to the total actual amount Brozowski paid out of pocket, and the evidence submitted showed very minimal expenditures on Brozowski’s part.

 Highfield maintains a record of customer orders it has taken from other competitors, with Inner-Tite being listed more frequently than any other competitor. There are also internal emails substantiating that Highfield has targeted Inner-Tite.

 The other method was to acquire a competitor’s product and study it. Holovnia, McClain and Brozowski all testified that acquiring samples of the competitors’ products was a common practice and not particularly difficult. All agreed that the utility customers would regularly give out samples of a company’s product to a competitor’s representative. Mahaney testified that even on a product that held a patent, when a particular product was good, it was not uncommon for a competitor to try to make a similar product, so long as it did not violate the patent.

 The cover letter and resume were prepared on the laptop Brozowski had been given by Inner-Tite. Of note, is that the resume submitted to Highfield states that Brozowski started with Inner-Tite in 2005, as opposed to 2007. Although Brozowski testified at the trial that this was a “mistake,” this mistake is carried throughout the resume and, in the court’s mind, again raises questions as to Brozowski’s credibility.

 Highfield’s southeast region is virtually the same as Inner-Tite’s, but also includes Central America and the Caribbean.

 There was no evidence that Brozowski questioned McClain, Cirella or anyone else at Highfield regarding this agreement, nor is there evidence that he sought legal advice before signing the agreement.

 Although this agreement is with Rexnord and does not mention Highfield specifically, the court finds that the agreement applies to Brozowski’s employment at Highfield on the basis that Highfield is a division of Rexnord and the agreement specifically includes “Rexnord or any business unit, division, subsidiary or affiliate thereof."

 The resignation letter to Holovnia also stated “[t]his has absolutely no causation from the way I was treated by you or anyone else at Inner-Tite. The company should be thankful they have you and you are a great supervisor. I was treated justly and appreciate the opportunity I was given to both enrich the company’s bottom line and my life experience.”

 The court does not credit Brozowski’s testimony that he did not tell Holovnia where he was going because he did not want to hear Holovnia make derogatory statements about Highfield. It is noteworthy that on October 7, 2009, Brozowski spoke with the human resources representative at Highfield and advised her that he was “not going to tell Inner-Tite that he is joining the Highfield team.” McClain was told this, but had no discussion with Brozowski about it.

 Brozowski deleted all of his files and folders from the laptop prior to its return. The court does not credit the portion of Brozowski’s testimony that he deleted the information in order to return the computer in the same condition he had received it in. Brozowski also claims he returned a memory stick (or flash drive) he had used to back-up his laptop. The court does not credit this testimony either. The court finds that before he returned the laptop to Inner-Tite, Brozowski downloaded and retained the information contained in the files and folders prior to deleting it from the laptop, as well as retaining the memory stick.

 Inner-Tite claims Brozowski failed to return copies of customer sales histories, call reports, annual sales reports, catalogues, the product training manuals, and copies of customer invoices. To the extent that any of this information was electronically stored on Brozowski’s computer, the court finds that Brozowski did not return it.

 Brozowski filed a number of trip reports (similar to call reports) from November 17, 2009 through January 22, 2010 substantiating that he actively solicited business for Highfield from Inner-Tite’s utilfiy customers in the southeast region. These reports indicated that many of the customers had not done business with Highfield, and several had never heard of Highfield. The utility customers Brozowski called on were customers of Inner-Tite’s he had serviced while employed at Inner-Tite.

 There is insufficient evidence to support a finding that Brozowski solicited this business for Highfield while still employed with Inner-Tite; however, there is sufficient evidence to support a finding that Brozowski used specific confidential contact information that he had only because he was Inner-Tite’s DSM in the southeast region to contact these specific individuals to arrange the lunch date.

 Again, Brozowski used his former position as Inner-Tite’s DSM in the southeast region to gain access to these sales representatives for Highfield.

 There was no evidence to suggest that Stevens had started to work for Dewalch prior to May 2009. Brozowski testified that in May 2008 he called Holovnia from the conference to tell him about Stevens working for Dewalch and that Holovnia told him he would look into it; however, Brozowski never heard anything more about it. To corroborate that testimony, Brozowski introduced a call report, which is dated May 2008, describing Brozowski seeing Stevens at the conference working for Dewalch. At the end of the trial, however, counsel for the parties stipulated that that call report (Exhibit 89) was misdated, and the correct date for that call report was May 2009, not May 2008. The court finds that Brozowski’s testimony on this subject represents another example of fabricated rationalization by Brozowski that he used to justify his decision to move to Highfield despite the restrictive covenant.

 Highfield has continued to pay Brozowski his salary.

 While there may be some who may question the enforce-abilify of this Court’s injunction in Georgia, or elsewhere, such an argument should not prevent this Court from exercising its proper authority. “Where Massachusetts has an interest in the employment relationship of Massachusetts employers and [its] employees that is significant, this Court should not deny an otherwise meritorious [request] for in-junctive relief simply because another state may not enforce the injunction . . .” EMC Corp. v. Donatelli, No. 091727BLS2 (Ma.Super. May 5, 2009) [25 Mass. L. Rptr. 399]. Also, by fully defending this action, Brozowski has submitted to personal jurisdiction of this Court. ”[U]nder full faith and credit, res judicata, and collateral estoppel, the final judgment of [Massachusetts] courts binds these parties as well as courts of other jurisdictions.” Hostetler, 267 Ga.App. at 329.

 Highfield corroborated this when McClain testified that the completely in-house manufacturing method employed by Inner-Tite was prohibitively expensive for Highfield.

 There was undisputed testimony that Brozowski did not make any sales on behalf of Inner-Tite anywhere other than in the southeast region.